**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MOL GLOBAL, INC. SECURITIES LITIGATION | Civil Action No. 14-Civ-9357 (WHP)<br><br><br>**JURY TRIAL DEMANDED**<br><br>**ECF Case** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION AND FACTUAL OVERVIEW ............................................. 1

II.   JURISDICTION AND VENUE ......................................................................................... 4

III.  PARTIES .......................................................................................................................... 4

   A.   Lead Plaintiff .............................................................................................................. 4

   B.   MOL ........................................................................................................................... 5

   C.   The Individual Defendants .......................................................................................... 5

   D.   The Underwriter Defendants ....................................................................................... 9

IV.   CLASS ACTION ALLEGATIONS ................................................................................. 12

V.    SUBSTANTIVE ALLEGATIONS .................................................................................. 15

   A.   MOL's Business ........................................................................................................ 15

   B.   MOL's IPO ............................................................................................................... 18

   C.   Misrepresentations in the Registration Statement ..................................................... 21

      1.   Consolidated and Segment Revenues and Revenue Growth for  2013
         and 1st Half of 2014 .......................................................................................... 22

         a.   The False Statements ..................................................................................... 22

         b.   Materiality ..................................................................................................... 28

      2.   Revenue Recognition .......................................................................................... 35

         a.   The False Statements ..................................................................................... 35

         b.   Materiality ..................................................................................................... 42

      3.   Internal Controls ................................................................................................. 42

         a.   Misleading Statements ................................................................................... 43

         b.   Materiality ..................................................................................................... 47

D.   Omissions from the Registration Statement .................................................... 48

   1.   Applicable Disclosure Requirements ........................................................ 48

   2.   Omission of MOL's Financial Results for the Third Quarter of 2014 ...................... 50

   3.   Materiality .......................................................................... 51

E.   Post-IPO Corrective Disclosures Reveal the Registration Statement's
Material Misrepresentations and Omissions, Causing Material Declines in
MOL ADS Value ................................................................................ 59

   1.   The November 20, 2014 Corrective Disclosure ........................................ 59

   2.   November 24, 2014:  As Trading in MOL ADS is Halted
Pending Further Information Requested from MOL,
MOL Investors File Suit Alleging Securities Act Violations.................................... 62

   3.   The December 1, 2014 Corrective Disclosure............................................ 63

   4.   Subsequent Disclosures on April 30, 2015................................................ 65

COUNT I ........................................................................................ 66

COUNT II ....................................................................................... 67

COUNT III ...................................................................................... 69

PRAYER FOR RELIEF ........................................................................... 70

JURY DEMAND .................................................................................. 70

Lead Plaintiff Lembaga Tabung Amanah Pekerja (the "TAP Retirement Fund" or "Lead Plaintiff"), individually and on behalf of all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of: (i) U.S. Securities and Exchange Commission ("SEC") filings by MOL Global, Inc. ("MOL" or the "Company"); (ii) press releases, presentations, conference calls with analysts and investors, and other public statements issued by MOL; and (iii) securities analyst reports, media reports and other publicly disclosed reports and information about Defendants. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth hereinafter after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION AND FACTUAL OVERVIEW

1.      This is an action on behalf of all persons or entities who purchased MOL American Depositary Shares ("ADSs"), pursuant and/or traceable to the Registration Statement for MOL's October 9, 2014 initial public offering of ADSs (the "IPO"), including (a) ADSs purchased in the IPO on or about October 9, 2014, as well as (b) ADSs purchased on the open market during the period from October 9, 2014 through November 21, 2014, inclusive (the "Class Period").

2.      The action charges MOL, certain of its officers, directors and controlling shareholders, and the underwriters of MOL's IPO (collectively and as further specified herein, "Defendants") with violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

3.      MOL, as further described herein, operates payment platforms that facilitate online and mobile commerce for consumers in emerging and other markets, in part by providing a large network of payment channels that accept payment in cash as well as other methods (*e.g.*,

credit cards, debit cards, e-payments, etc.). MOL is the largest e-payment enabler for online goods and services in Southeast Asia.

4.     On October 9, 2014, Defendants completed MOL's IPO, selling 13.5 million ADSs at a price to the public of $12.50 per ADS and receiving $168.75 million in gross proceeds, pursuant to a registration statement on Form F-1 filed with the SEC on July 14, 2014 and subsequent amendments thereto (filed with the SEC, respectively, on August 20, September 23 and October 3, 2014), together with a final prospectus dated October 9, 2014 (the "Prospectus" and, collectively with the registration statement, as amended, and all exhibits thereto and all documents incorporated therein, the "Registration Statement").   Since the IPO, MOL ADSs have traded on the Nasdaq stock market under the symbol "MOLG."

5.     The Registration Statement was negligently prepared, and as a result contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and was not prepared in accordance with the rules and regulations governing the preparation of such documents.  Specifically, the Registration Statement:

a.   contained untrue statements of material fact concerning:

i.   the revenues and revenue growth reported throughout 2013 and the 1st half of 2014 for MOL as a whole, as well as for MOL's crucial MOLPay segment, which Defendants had identified in the Registration Statement as MOL's primary post-IPO "growth driver;"

ii.   MOL's revenue recognition policies and practices; and

iii.   MOL's internal controls over financial reporting; and

b.   omitted to disclose MOL's results of operations for the 3rd quarter of 2014, which had ended on September 30, 2014 (nine days prior to the IPO).

6.     In a series of post-IPO disclosures stretching from November 20, 2014 through April 30, 2015 (but in material part concentrated to the 12-day period between November 20, 2014 and December 1, 2014), MOL corrected the Registration Statement's above-summarized material misstatements and omissions.  Among other things, MOL admitted that:

a.  revenues for 2013 and the 1st half of 2014, as reported in the Registration Statement, were overstated;

b.  during the same period, it had recognized revenues improperly and contrary to the revenue recognition policies and practices described in the Registration Statement;

c.  MOL's internal controls over financial reporting suffered from far more extensive "material weaknesses" than disclosed in the Registration Statement; and

d.  MOL's financial results for the period immediately preceding the IPO, Q3 2014, had materially and negatively diverged from the positive trends indicated by the prior period financial results disclosed in the Registration Statement.

7.      As these truths concerning MOL emerged and corrected the information provided in the Registration Statement, MOL ADS suffered substantial declines in value.

8.      Damages under the Securities Act are, presumptively, the difference between: (1) the price at which MOL ADS were purchased, albeit in no event exceeding the IPO price ($12.50 per ADS); and (2) for Class Members who continue to hold MOL ADS, the "value" of MOL ADS at the time when Securities Act claims were first filed (November 24, 2014), and for Class Members who sold MOL ADS, the greater of the ADS sale price or the aforementioned ADS "value" as of November 24, 2014.  Usually, such "value" is indicated by the market price of the security in question.  However, and as further detailed herein, the *value* of MOL ADS as of November 24, 2014 was substantially less than the *market price* of MOL ADS as of November 24, 2014 ($4.09 per ADS), because:

a.  market trading in MOL ADS had previously been halted by Nasdaq, pending provision from MOL of "additional information" concerning its financial results that Nasdaq required in order to allow MOL ADS trading to resume;

b.  consequently, between November 24 and November 28, 2014, when such "additional information" was not forthcoming from MOL, the price of MOL's ADS was *frozen* at its closing price on November 21, 2014:  $4.09 per ADS; and

      c.   when MOL provided such "additional information" on the morning of December

1, 2014, and further revealed the Registration Statement's falsities, MOL ADS

resumed trading and, by the end of the same day, closed trading at $1.69 per ADS.

## II.   JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and

15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

10.     This court has jurisdiction over this action pursuant to Section 22 of the Securities

Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to Section 22 of the Securities Act, and

28 U.S.C. § 1391 (b), (c) and (d). Many of the acts and conduct complained of herein, including

the preparation and dissemination of materially false information in connection with the IPO, and

the IPO, occurred in substantial part in this District. The Underwriter Defendants maintain their

principal places of business in this District, and MOL ADSs traded on the Nasdaq stock

exchange, based in this District, at all relevant times subsequent to the IPO.

12.     In connection with the acts and conduct alleged in this Complaint, defendants,

directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications and the facilities of the national

securities markets.

## III.   PARTIES

### A.   Lead Plaintiff

13.     Lead Plaintiff TAP Retirement Fund purchased MOL ADSs in the IPO, and was

damaged thereby, as detailed in the sworn certification that Lead Plaintiff previously filed with

the Court, which is incorporated herein by reference. The MOL ADSs purchased by Lead

Plaintiff in the IPO were sold to Lead Plaintiff by Defendant Deutsche Bank.

### B.    MOL

14.     Defendant MOL is a holding company for MOL's various operating businesses, incorporated on February 20, 2014 under Cayman Islands law by an entity, MOL Ventures Pte. Ltd. ("MOL Ventures"), wholly owned and controlled by Defendants Tan and Bangah, in anticipation of, and in order to serve as a vehicle for, MOL's IPO.  MOL's principal place of business is located at Lot 7.03 & 8.03, Level 7&8, Berjaya Times Square, No. 1 Jalan Imbi, 55100 Kuala Lumpur, Malaysia.  MOL also maintains offices in the various countries in which it operates, including in the United States, Thailand, Indonesia, Singapore, Vietnam, Taiwan, Australia and the Philippines.

15.     MOL sold 7,485,030 ADSs in the IPO, receiving approximately $82.5 million in net proceeds after paying (a) an underwriting discount and commission of $0.75 per ADS to the Underwriter Defendants, and (b) IPO-related expenses of $5.75 million.  As further detailed herein, MOL thereafter used certain of these net proceeds to repay loans previously provided to MOL by MOL Ventures.

### C.    The Individual Defendants

16.     Defendant Ganesh Kumar Bangah ("Bangah") was, at the time of the IPO and all times prior thereto, MOL's Chief Executive Officer ("CEO"), and a member of MOL's Board of Directors. Subsequent to the IPO, on March 27, 2015, it was announced that Charles Chee Chau Ng and Preecha Praipattarakul would succeed Defendant Bangah as co-CEOs, and that Defendant Bangah would thereafter occupy the role of Executive Chairman.

17.     Defendant Bangah:

a.   signed the Registration Statement;

b.   prior to the IPO, beneficially owned 6,795,480 MOL ordinary shares, of which 69,294 were sold as ADSs in the IPO;[1] and

---

[1] These sales were made by MOL Ventures, in which Defendant Bangah possessed an 11.6% equity interest.  MOL Ventures held 7,563,837 MOL ordinary shares at the time of the IPO, and sold 601,497 shares as ADSs in the IPO. Defendant Bangah's 11.6% equity interest in MOL Ventures, coupled with MOL Ventures' sale of 601,497 shares as ADSs in the IPO, equates to the sale in the IPO of 69,294 MOL shares beneficially owned by Defendant Bangah.

    c.   spent, by his own admission, "50% of his time" during the 10 months prior to the IPO working on the IPO, including, during the 3 weeks prior to the IPO, participating in MOL's Roadshow as it traveled across the U.S., during which time he made "up to four investor presentations a day."[2]

18.    Defendant Allan Sai Wah Wong ("Wong") was, at the time of the IPO, MOL's Chief Financial Officer ("CFO").  Shortly after the IPO, on or about November 20 and effective on or about November 21, 2014, Wong resigned from MOL.  Defendant Wong signed the Registration Statement.

19.    Defendant Craig White ("White") is, and was at the time of the IPO, MOL's President, and a member of MOL's Board of Directors.  Defendant White signed the Registration Statement.

20.    Defendants Bangah, Wong and White are sometimes referred to collectively herein as the "Officer Defendants."

21.    Defendant Yit Fei Chang ("Chang") is, and was at the time of the IPO, a member of MOL's Board of Directors.  Defendant Chang signed the Registration Statement.

22.    Defendant Tek Kuang Cheah ("Cheah") is, and was at the time of the IPO, a member of MOL's Board of Directors.

23.    Defendant Mun Kee Chang ("M.K. Chang") is, and was at the time of the IPO, a member of MOL's Board of Directors.

24.    Defendant Eric He ("He") is, and was at the time of the IPO, a member of MOL's Board of Directors.

25.    Defendant Noah J. Doyle ("Doyle") is, and was at the time of the IPO, a member of MOL's Board of Directors.

26.    Defendants Cheah, M.K. Chang, He and Doyle are sometimes referred to collectively herein as the "Independent Directors."  Each of the Independent Directors was

---

[2] *See* Karamjit Singh "MOL Global Now Has to Deliver Gold to Investors," *Digital News Asia*, October 13, 2014, available at: https://www.digitalnewsasia.com/insights/mol-global-now-has-to-deliver-gold-to-investors.

named in the Registration Statement as a person who, upon effectiveness of the Registration Statement, would become an MOL independent director, and each of the Independent Directors submitted signed consent to such references in the Registration Statement, pursuant to Rule 438 promulgated under the Securities Act, 17 C.F.R. § 230.438. The Independent Directors' consents were included, respectively, as exhibits 23.5, 23.6, 23.7 and 23.8 to the Registration Statement. The Independent Directors are therefore liable for misstatements in the Registration Statement under Section 11(a)(3) of the Securities Act.

27. The Independent Directors, together with Defendants Bangah, White and Chang, are sometimes referred to collectively herein as the "Director Defendants."

28. Defendant Tan Sri Dato' Seri Vincent Tan ("Tan"), together with what the Registration Statement described as "his entities and affiliates" is, and was at the time of the IPO, MOL's controlling shareholder. Defendant Tan:

    a. prior to the IPO, owned a 69.3% interest in MOL, by virtue of his:

        i. direct ownership of 110,764 MOL ordinary shares;

        ii. 89.9% effective equity interest in MOL.com Sdn. Bhd., which owned 14,618,356 MOL ordinary shares;

        iii. 60.0% equity interest, and an additional 40.0% equity interest held by his son, Dato' Robin Tan Yeong Ching, in Hotel Resort Enterprise Sdn. Bhd., which owned 13,706,739 MOL ordinary shares;

        iv. 75.5% effective equity interest (and an additional 10.0% equity interest held by his son, Rayvin Tan Yeong Sheik) in MOL Ventures, which owned 7,563,837 MOL ordinary shares;

        v. 100% equity interest in MOL Investments Pte. Ltd., which owned 3,057,669 MOL ordinary shares; and

        vi. interest and/or control over 5,089,176 MOL ordinary shares held directly by his son Rayvin Tan Yeong Sheik.

    b.   in and through the IPO, sold 5,709,700 of his beneficially-owned MOL shares as ADSs, by:

        i.   the sale by MOL.com Sdn. Bhd. (in which Defendant Tan held an 89.9% effective equity interest) of 2,153,568 ADSs;

        ii.   the sale by Hotel Resort Enterprise Sdn. Bhd. (in which Defendant Tan held a 60.0% equity interest, and an additional 40.0% equity interest held by his son, Dato' Robin Tan Yeong Chin) of 2,320,018 ADSs;

        iii.   the sale by MOL Ventures (in which Defendant Tan held a 75.5% effective equity interest, and an additional 10.0% equity interest held by his son, Rayvin Tan Yeong Sheik) of 601,497 ADSs;

        iv.   the sale by MOL Investments Pte. Ltd., (in which Defendant Tan held a 100% effective equity interest) of 190,152 ADSs;

        v.   the direct sale by Defendant Tan's son, Rayvin Tan Yeong Sheik, of 749,735 ADSs.

    c.   <u>subsequent</u> to the IPO, given the above-detailed holdings and sales, possessed a 53.1% interest in MOL.

29.    Defendants MOL, Tan and Bangah, who sold ADS in the IPO,[3] are sometimes referred to collectively herein as the "Selling Shareholder Defendants."

30.    Defendants Bangah, Wong, White, Chang, Cheah, M.K. Chang, He, Doyle and Tan are sometimes referred to collectively herein as the "Individual Defendants."

31.    MOL and the Individual Defendants are sometimes referred to collectively herein as the "MOL Defendants."

---

[3] Defendants Tan's and Bangah's sales were accomplished primarily through the above-detailed sales of ADS by various affiliates, entities and related persons that Defendants Tan and Bangah owned and/or controlled.

### D. The Underwriter Defendants

32. Defendant Citigroup Global Markets Inc. ("Citigroup"), headquartered at 388 Greenwich Street, New York, New York 10003, acted as one of the IPO's three lead underwriters. Among other things, Citigroup:

   a. purchased 6,682,500 ADS from MOL and the other Selling Shareholder Defendants, at a price of $11.75 per ADS (the $12.50 IPO price less $0.75 in underwriting discounts and commissions);

   b. undertook to sell, and/or sold, 6,682,500 ADS to Class members in the IPO, at a price of $12.50 per ADS; and

   c. helped to draft and disseminate the Registration Statement.

33. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank"), headquartered at 60 Wall Street, New York, New York 10005, acted as one of the IPO's three lead underwriters. Among other things, Deutsche Bank:

   a. purchased 4,009,500 ADS from MOL and the other Selling Shareholder Defendants, at a price of $11.75 per ADS (the $12.50 IPO price less $0.75 in underwriting discounts and commissions);

   b. undertook to sell, and/or sold, 4,009,500 ADS to Class members in the IPO, at a price of $12.50 per ADS;

   c. sold MOL ADSs to Lead Plaintiff in the IPO; and

   d. helped to draft and disseminate the Registration Statement.

34. Defendant UBS Securities LLC ("UBS"), headquartered at 1285 Avenue of the Americas, New York, NY 10019, and with further offices at 299 Park Avenue, New York, NY 10171, acted as one of the IPO's three lead underwriters. Among other things, UBS:

   a. purchased 2,673,000 ADS from MOL and the other Selling Shareholders, at a price of $11.75 per ADS (the $12.50 IPO price less $0.75 in underwriting discounts and commissions);

b.  undertook to sell, and/or sold, 2,673,000 ADS to Class members in the IPO, at a price of $12.50 per ADS; and

c.  helped to draft and disseminate the Registration Statement.

35.     Defendants Citigroup, Deutsche Bank and UBS are referred to collectively herein as the "Underwriter Defendants."

36.     Pursuant to an underwriting agreement (the "Underwriting Agreement") between the Underwriter Defendants and the Selling Shareholders, the Underwriter Defendants underwrote the IPO on a firm commitment basis, committing to purchase from the Selling Shareholders the above-detailed amounts of ADSs – totaling 13,365,000 ADSs, or 99% of the 13,500,000 ADSs offered and sold in the IPO.[4]

37.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

a.  The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared approximately $10.12 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize MOL ADS in the IPO.

b.  The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from MOL including Defendant Bangah, met with potential investors and presented them with information about MOL, its operations, and its finances (the "MOL Roadshow").  The MOL Roadshow began on or about September 23, 2014, and included an extensive series of meetings with and presentations to U.S. investors between then and the IPO, during which time MOL Roadshow participants made as many as 4 presentations per day to different groups of prospective investors.  By October 3, 2014, the Underwriter

---

[4] Pursuant to the Underwriting Agreement, the Underwriter Defendants agreed to act as representatives for all other underwriters involved in the MOL IPO, to whom 135,000 ADSs, or 1% of the total, were allocated.

Defendants reported having distributed more than 1,700 copies of MOL's registration statement and preliminary prospectus, dated September 23, 2014, to "prospective underwriters, institutional investors, dealers and others."

c.  The Underwriter Defendants also demanded and obtained an agreement from MOL that MOL would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws with respect to the IPO. They also made certain that MOL had purchased millions of dollars in directors' and officers' liability insurance.

d.  Representatives of the Underwriter Defendants also assisted MOL and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into MOL's business, operations and finances, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning MOL's operations and finances.

e.  In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with MOL's lawyers, management and top executives and engaged in "drafting sessions" between at least April 2014 and October 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which MOL ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of these contacts, the Underwriter Defendants had access to the information underlying the material misrepresentations or omissions alleged herein.

  f. The Underwriter Defendants failed to perform adequate due diligence, and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately.

  g. The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of the securities registered thereby, including offers and sales to Lead Plaintiff and the Class.

  38. The Underwriter Defendants' failure to conduct adequate due diligence was a substantial factor leading to the harm complained of herein.

## IV. CLASS ACTION ALLEGATIONS

  39. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all those who purchased MOL ADS pursuant and/or traceable to the Registration Statement, including (a) those who purchased MOL ADS in the IPO itself on or about October 9, 2014, as well as (b) all those who purchased MOL ADS in the open market during the period from October 9, 2014 through and including November 21, 2014 (the "Class Period").

  40. As detailed below, the 13.5 million MOL ADSs sold in the IPO pursuant to the Registration Statement constituted, throughout the Class Period, the entire universe of ADSs available for purchase and/or sale in the market.  Consequently, all open-market purchasers of MOL ADS throughout the Class Period purchased MOL ADS that were issued pursuant to, and that are directly and necessarily traceable to, the Registration Statement.

  41. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable. 13.5 million MOL ADS were issued and sold in the IPO, and, during the Class Period, average daily MOL ADS trading volume exceeded 750,000 ADSs per day. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MOL or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     During the Class Period, *all* MOL ADS that traded in the open market subsequent to the IPO – and, thus, all MOL ADS purchased by Class members subsequent to the IPO – were directly, and necessarily, traceable to the Registration Statement.  The following facts establish that, throughout the Class Period, the *only* MOL ADS available on the market were the MOL ADS issued, offered and sold in the IPO, pursuant to the Registration Statement:

a.   the IPO was the *initial* public offering of MOL ADS, and, "[p]rior to this offering, there has been no public market for the ADSs" (Prospectus, at cover page, 38, 197);

b.   no other MOL ADS were made available to the equity markets, because:

c.   no subsequent "secondary" offerings or sales of MOL ADSs were made;

d.   MOL, all of MOL's directors and officers, and *all* of MOL's existing shareholders, entered into "lock-up agreements" pursuant to which they agreed "not to offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale, lend or otherwise dispose of, except in this offering [the IPO], any of our ordinary shares or ADSs or securities that are substantially similar to our ordinary shares or ADSs, including but not limited to any options or warrants . . ." for a period of "180 days after the date of this prospectus [the Prospectus]" (Prospectus, at 197); and

e. as a result of such lock-up agreements, all remaining MOL shares and/or ADSs – *i.e.*, those held by MOL, MOL officers and directors, and MOL's existing shareholders – were barred from any possible introduction into the market during the Class Period, which ended well before the 180 day lock-up period expired;

f. Consequently, as MOL stated in its Form 20-F for 2014, filed with the SEC on or about April 30, 2015 ("MOL Form 20-F"), as of December 31, 2014 there were only "13,500,000 ADSs (equivalent to 13,500,000 ordinary shares) outstanding" – *i.e.*, exactly the same number of ADSs that had been offered in the IPO.  *See* MOL 2014 Form 20-F, at 32.

44.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.  Typicality is all the stronger here given (a) the brevity of the Class Period, and (b) that, after the disclosures in the Registration Statement and Prospectus, MOL made no further material disclosures during the Class Period (*e.g.*, MOL did not release any further or new information concerning its operations, results of operations, or financial results) until its November 20, 2014 disclosure announcing that MOL would delay release of its financial results for the third quarter of 2014 and that Defendant Wong had resigned.

45.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a. whether Defendants' acts as alleged herein violated the Securities Act;

b. whether the Registration Statement contained inaccurate statements of material fact, and/or omitted material information required to be stated therein; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.     SUBSTANTIVE ALLEGATIONS

48.     Lead Plaintiff's Securities Act claims alleged herein are not based on any allegations of intentional or reckless misconduct on the part of the Defendants, and do not allege fraud. Lead Plaintiff specifically disclaims any reference to or reliance upon allegations of fraud in these non-fraud claims under the Securities Act.

### A.     MOL's Business

49.     MOL describes itself as the largest e-payment enabler for online goods and services in Southeast Asia.[5]   As the population in this region (and other emerging markets in which MOL operates) is marked *inter alia* by very low rates of credit card usage and banking services, MOL found its initial niche as a bridge for "offline" populations to access online content, in substantial part by developing an extensive local network of physical locations across Southeast Asia (*e.g.*, 7-Eleven convenience stores) where consumers could purchase online and mobile telephone goods and services via cash payments.   More recently, MOL has expanded its product offerings: (a) to accept and process payments made from credit card accounts, online banking accounts, and mobile telephone accounts; (b) to provide its e-payment solutions to online merchants in the region, allowing them to accept cash, credit card or bank account payments from consumers; and (c) to provide its own online goods and services.

---

[5] Although its business and operations have historically centered in Southeast Asia (primarily Malaysia, Indonesia, Thailand, Vietnam the Philippines, Australia and New Zealand), MOL has expanded its operations to include the Americas (primarily, Brazil and the U.S.) and the Middle East (primarily Turkey).

50.     MOL divides its business into four product segments:  MOLPoints, MOLReloads, MOLPay, and MMOG.asia (in addition to an "Other" segment).

a.  **MOLPoints**.  MOL sells and operates MOLPoints, which after being purchased (by cash in physical locations that offer them, or online through credit cards, online banking and other e-payment services) can be used as credits to make in-game purchases in thousands of online games, and in other digital content, that accept MOLPoints as currency.

b.  **MOLReloads**.  MOL sells and operates MOLReloads, which allow consumers in Southeast Asia to purchase additional amounts of pre-paid mobile airtime (*i.e.*, to "top up" their mobile phone accounts) from major regional telecommunications service providers, including through cash payment in MOL's extensive physical distribution network (*e.g.*, 7-Eleven stores equipped with MOLReloads terminals).

c.  **MOLPay**.  MOLPay is an integrated payments solution for online merchants, which allows them to offer their goods for purchase by consumers through cash, online banking and/or credit card processing.

d.  **MMOG.asia**.  MMOG.asia is an online video game portal hosted by MOL, in which MOL licenses games from developers and offers them on a free-to-play basis to consumers through its MMOG.asia portal, but allows in-game purchases to be made only with currencies purchased from MOL (MOLPoints or MCoins).

51.     In addition to the above-mentioned MOL product offerings, MOL was also developing two new products:  MOLWallet, for consumers, and MOLCube, for businesses. MOLWallet was intended to allow consumers to replace their physical wallets with mobile phones:  *i.e.*, to allow people to pay for digital and physical goods and services through their mobile phones.  MOLCube was intended as a mobile point of sale terminal, providing small and medium-sized businesses with a mobile payment platform that would allow them to accept credit- and debit-card payments through mobile phones.

52.     In the Registration Statement, MOL referred to its two largest and most mature products – MOLPoints and MOLReloads – as its "Current Core Products."  *See* Prospectus at 129.  Throughout 2011, 2012, 2013 and the first half of 2014, these two products were responsible at all times for more than 75% of MOL's revenues and more than 70% of MOL's gross profits.  *See* Prospectus at F-30-32, F-125 (segment revenues and gross profits for these periods).

53.     Although MOL's MOLPay was smaller than MOLPoints and MOLReloads, it was of crucial importance to MOL and MOL investors.  In the Registration Statement and other public documents, Defendants identified MOLPay, which was growing much faster than MOL's Current Core products, as MOL's main "Growth Driver" for the years following the MOL IPO.  *See* Prospectus at 129 (setting forth MOL's "product roadmap with growth drivers"); *see also* MOL's "Company Presentation," (upon information and belief, the presentation used by Defendants in the Roadshow) at 16 (slide titled "MOLPay driving near term growth"), 21-22 (showing "Fastest growth in MOLPay…").[6]

54.     Likewise, MMOG.asia, though smaller than MOLPoints and MOLReloads, was a crucial driver of MOL's profits, as a result of MMOG.asia gross profit margins that exceeded 90% (and substantially exceeded the profit margins generated by MOL's other products).  *See e.g.* Prospectus, at F-30-32, F-125-26 (MOL revenues and profits, by segment, for 2011, 2012, 2013 and first half of 2014); MOL, Q1 2015 Earnings Call Transcript, May 27, 2015, at 4 ("…MMOG.asia [] has historically had a gross profit margin of over 90%").

55.     Finally, MOL's products in development – MOLWallet and MOLCube – were intended to provide MOL with new sources of growth in the more remote future (*e.g.*, 3-5 years after the IPO).  *See* Prospectus at 129.

---

[6] Available through MOL's website at:
http://media.corporateir.net/media_files/IROL/25/253695/20141020_Company_Pres-v1.pdf.

### B.   MOL's IPO

56.   On or about April 17, 2014, taking advantage of the recently-passed Jumpstart Our Business Startups Act (the "JOBS Act"), Defendants caused MOL to file a draft registration statement for an IPO of MOL ADS, signed by Defendants Bangah, White and Chang, for nonpublic SEC review and comment.   In the following months, the SEC corresponded privately with Defendants concerning the draft registration statement and its contents, including in letters dated May 16, 2014 (SEC letter to MOL with comments and questions on draft registration statement), June 4, 2014 (MOL letter to SEC, with responses and answers to SEC comments, and enclosing an amended draft registration statement), July 3, 2014 (SEC letter to MOL with further comments and questions), and July 14, 2014 (MOL reply to SEC comments and questions, enclosing initial, public registration statement).

57.   On or about July 14, 2014, Defendants MOL, Bangah, White, Chang, Chong, Cheah, M.K. Chang and He, together with the Underwriter Defendants and non-party Credit Suisse (then identified as an underwriter for the IPO), caused MOL to file a public registration statement on Form F-1 in connection with an IPO of MOL ADS.   In subsequent months, the initial registration statement was subsequently amended by:

   a.   Amendment 1 on Form F-1/A, filed with the SEC on or about August 20, 2014, signed additionally by Defendants Wong (replacing Chong as MOL CFO) and Doyle;

   b.   Amendment 2 on Form F-1/A, filed with the SEC on or about September 23, 2014, together with a preliminary "red herring" prospectus of the same date, seeking to register 22.38 million ADS to be sold at $14.50 per ADS (with Credit Suisse no longer listed as an underwriter);[7]

---

[7] On or about September 24, 2014, Bank of New York Mellon, as depositary for the MOL ADS, filed a related registration statement on Form F-6 to register the ADSs.

c. Amendment 3 on Form F-1/A, filed with the SEC on or about October 3, 2014, together with a preliminary "red herring" prospectus of the same date, seeking to register 22.38 million ADS to be sold at $14.50 per ADS;

d. a Free Writing Prospectus, filed with the SEC on or about October 9, 2014, updating certain information in the October 3, 2014 preliminary prospectus to indicate that MOL and the Selling Shareholders now sought to sell 13.5 million ADSs at $12.50 per ADS (*i.e.*, updating prior figures for number and price of ADS in the October 3, 2014 filing); and

e. a final prospectus on Form 424b4, dated October 9, 2014 and filed with the SEC upon the closing of the MOL IPO on or about October 14, 2014 (the "Prospectus").[8]

58. The above-detailed registration statement and its amendments thereto, of which the Prospectus was a part (as Defendants repeatedly stated in the Prospectus),[9] are referred to as the Registration Statement.

59. On October 3, 2014, in conjoined letters to the SEC from MOL (signed by Defendant Bangah) and the Underwriter Defendants, Defendants requested the SEC to declare

---

[8] Concurrently with these amendments, the SEC and MOL continued to correspond over the contents of the Registration Statement and IPO timeline, including in letters dated August 8, 2014 (SEC comments and questions directed to MOL), August 20, 2014 (MOL replies to SEC, together with amended Registration Statement), September 3, 2014 (further SEC comments and questions to MOL), September 23, 2014 (MOL replies to SEC, together with amended Registration Statement), and October 3, 2014 (MOL requesting that the SEC declare the Registration Statement effective on October 8, 2014).  In addition, the Underwriter Defendants also corresponded with the SEC, including in a letter from the former to the latter dated October 3, 2014 (joining MOL in request to SEC to declare the Registration Statement effective on October 8, 2014).

[9] *See e.g.* Prospectus at 213 ("We have filed a registration statement, including relevant exhibits, with the SEC on Form F-1 under the Securities Act with respect to the underlying ordinary shares represented by the ADSs to be sold in this offering. . . This prospectus, which constitutes a part of the registration statement on Form F-1, does not contain all of the information contained in the registration statement. You should read those registration statements and their exhibits and schedules for further information with respect to us and the ADSs."); *see also* at 9 ("… the registration statement that includes this prospectus"), 24 ("… filed as an exhibit to the registration statement of which this prospectus forms a part"), 47 ("You should read this prospectus and the documents that we refer to in this prospectus and have filed as exhibits to the registration statement, of which this prospectus is a part"), 168 ("… upon the effectiveness of our registration statement of which this prospectus forms a part."), 206 ("…the registration statement of which the prospectus forms a part.").

the Registration Statement effective at 5:00 PM on October 8, 2014.  In connection with its

October 3, 2014 request, MOL acknowledged *inter alia*:

> the action of the Commission or the Staff, acting pursuant to delegated authority, in declaring the filing effective, does not relieve the Company from its full responsibility for the adequacy and accuracy of the disclosure in the filing; and
>
> the Company may not assert Staff comments and the declaration of effectiveness as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

60.     The SEC declared the Registration Statement effective on October 8, 2014, and

Defendants completed the MOL IPO shortly thereafter, before the markets opened for trading on

October 9, 2014.

61.     In and through the IPO, Defendants registered, issued and sold – to the Class –

13.5 million MOL ADS at a price of $12.50 per ADS.

62.     MOL itself sold approximately 55% of the ADS issued, offered and sold in the

IPO:  specifically, 7,485,030 MOL ADS, for which MOL received $87,949,103 ($11.75 per

ADS, representing the $12.50 offering price to the public minus the $0.75 per ADS underwriting

discount and commission charged by the Underwriter Defendants).  After paying a further $5.75

million in various expenses related to the IPO (primarily, legal fees of $3 million and accounting

fees of $2 million), net proceeds to MOL were approximately $82.2 million. *See* Prospectus at

cover page, 9, 204, and 210.  A substantial portion of MOL's net proceeds were then used to

repay loans previously extended to MOL by MOL Ventures, a related entity wholly owned by

Defendants Tan and Bangah.  *See* Prospectus at 48; Form 20-F at 106 (~$9 million of loans

outstanding as of December 31, 2013 were repaid in entirety by December 31, 2014) and 106 n.4.

63.     Defendants Tan and Bangah, through their affiliates and related entities (as

detailed above in Section III.C, *supra*, sold approximately 45% of the ADS issued, offered and

sold in the IPO:  specifically, 6,014,970 MOL ADS, for which they received $70,675,898

($11.75 per ADS, representing the $12.50 offering price to the public minus the $0.75 per ADS

underwriting discount and commission charged by the Underwriter Defendants). *See* Prospectus at cover page, 9, and 204.  Defendants Tan and Bangah, through their co-owned MOL Ventures affiliate, received further proceeds from the MOL IPO when MOL subsequently used approximately $9 million of *its* IPO proceeds to repay loans previously extended to MOL by MOL Ventures.

64.     The Underwriter Defendants, for their part in the MOL IPO, including underwriting the above-mentioned issuance and sale of 13.5 million ADS by the Selling Shareholder Defendants, charged underwriting discounts and commissions of $0.75 per ADS, receiving $10,125,000.  *See* Prospectus at cover page, 9, and 204.

65.     However, the Registration Statement pursuant to which MOL's IPO was effected:

    a.  contained untrue statements of material fact, as detailed in Section V.C *infra*; and

    b.  omitted to state other material facts necessary to make such statements not misleading, and was not prepared in accordance with the rules and regulations governing its preparation, as detailed in Section V.D *infra*.

**C.     Misrepresentations in the Registration Statement**

66.      The Registration Statement contained untrue statements of material facts concerning:

    a.  MOL's revenues and revenue growth throughout 2013 and the 1st half of 2014 (*see* Section V.C.1, *infra*), on both:

        i.  a consolidated basis for MOL overall; and

        ii.  a segment basis, for MOL's critical MOLPay segment, which Defendants had identified in the Registration Statement as the primary driver of MOL's near-term growth;

    b.  MOL's revenue recognition policies and practices (*see* Section V.C.2, *infra*); and

    c.  MOL's internal controls (*see* Section V.C.3, *infra*).

1.      **Consolidated and Segment Revenues and Revenue Growth for 2013 and 1st Half of 2014**

a.  **The False Statements**

67.     The Registration Statement made numerous representations, including but not limited to representations in (i) the audited financial statements for MOL and its subsidiary companies for the years ended December 31, 2011, 2012 and 2013 ("the "2013 Financial Statements"), and (ii) the unaudited condensed interim consolidated financial statements for the six months ended June 30, 2014 (the "1st Half 2014 Financial Statements") that were part of the Registration Statement, concerning:

   a.  MOL's consolidated revenues and revenue growth during 2013 and the 1st half of 2014;

   b.  MOL's segment revenues and revenue growth for the MOLPay product/segment during 2013 and the 1st half of 2014; and

   c.  MOL's segment revenues and revenue growth for MOL's "Other" geographical region (which included Vietnam) during 2013 and the 1st half of 2014.

68.     Subsequent to the IPO, between November 20, 2014 and April 30, 2015, MOL revealed that the representations in the Registration Statement concerning the above three matters were not accurate.  Specifically:

   a.  on November 20, 2014, MOL issued a press release titled "MOL Global Inc. Announces Schedule Changes for Third Quarter 2014 Financial Results and Management Changes," in which it announced, without further explanation, that the release of Q3 2014 results, which had previously been scheduled for November 21, 2014,[10] would instead be delayed until the morning of December 3, 2014;

---

[10] *See* MOL's November 11, 2014 press release titled "MOL Global Inc. to Announce Third Quarter 2014 Financial Results," which previously set the Q3 2014 results release for the morning of November 21, 2014.

b.  on December 1, 2014, when MOL released its Q3 2014 results (after again rescheduling the release from December 3 to December 1):[11]

   i.  MOL revealed that its previously-reported 2013 and 1st half 2014 revenues and revenue growth for MOL, MOL's MOLPay segment, and MOL's "Other" geographical region, as reported in the Registration Statement, had been overstated through improper revenue recognition and were thus incorrect;[12]

   ii.  MOL disclosed purportedly corrected, and lower, consolidated revenue figures for such periods; and

   iii.  Defendant Bangah explained that the MOL's November 20, 2014 disclosures were occasioned by and related  to MOL's inaccurate financial reporting for 2013 and 1st half 2014:

> BANGAH:  To begin with we sincerely apologize to all of our investors for the delay in our earnings announcement for the third quarter.  The recent discovery of the accounting error at our Vietnamese subsidiary forced us to delay the announcement in order to properly understand the issue, rectify it, and be able to provide our shareholders with a clear picture of the situation.[13]

---

[11] *See* MOL's November 25, 2014 press release titled "MOL Global Inc. Announces Schedule Change for Third Quarter 2014 Financial Results," which re-set the Q3 2014 results release for the morning of December 1, 2014.

[12] *See* MOL's December 1, 2014 press release titled "MOL Global Inc. Reports Unaudited Financial Results for the Three Month Period Ended September 30, 2014, and Other Material Developments," at its subsection titled "Recent Developments:  Certain Errors in the Company's Revenue and Direct Cost and Other Ancillary Expenses in its Consolidated Statements of Profit or Loss and Other Comprehensive Income for the Six Month Periods ended June 30, 2013 and 2014, the Three Month Periods ended March 31, 2014 and June 30, 2014 and the year ended December 31, 2013."  The December 1, 2014 press release, although explaining that the improper revenue recognition had occurred at MOL's Vietnamese subsidiary, Nganluong Joint Stock Company ("NJSC"), did not make explicit that the improper revenue recognition had occurred specifically in connection with the MOLPay product/segment (which NJSC and other MOL subsidiaries offered).  Instead, the December 1, 2014 press release focused on MOL's *consolidated* revenues for 2013 and the 1st half of 2014, and provided purportedly corrected revenue figures for such periods for MOL overall.  As detailed below, MOL's subsequent disclosures on April 30, 2015: (a) provided further and final corrections to these revenue figures, and (b) made clear that the improper revenue recognition had effected only the MOLPay product segment and only the "Other" geographical region segment.

[13] *See* December 1, 2014 MOL 3rd Quarter 2014 Earnings Conference Call (audio recording) at 1:56 to 2:16, available at:  http://ir.mol.com/phoenix.zhtml?c=253695&p=irol-presentations.

c.   on April 30, 2015, MOL disclosed further-updated and final corrections to previously reported revenues for 2013 and the 1st half of 2014, in a Form 6-K filed with the SEC (attaching restated financial statements for each of the first three quarters of 2014, as well as for the 1st half of 2014), and in its Form 20-F.[14]

69.   In sum, as admitted in MOL's Form 20-F:

> the revenue line item . . . in our consolidated statements of profit or loss and other comprehensive income for the three month periods ended June 30, 2013, September 30, 2013, December 31, 2013, March 31, 2014 and June 30, 2014, the six month periods ended June 30, 2013 and 2014, and the year ended December 31, 2013 included in our registration statement on Form F-1, as amended (File Number: 333-197401) in relation to our initial public offering [was] overstated . . .

See MOL Form 20-F, at 15.

70.   Tables 1-3 below identify these untrue statements of fact in the Registration Statement, as admitted by MOL, and their correction, as later specified by MOL between November 20, 2014 and April 30, 2015, concerning revenues (all figures in Malaysian Ringgit ("MR")) and revenue growth for 2013 and the 1st half of 2014 for MOL on a consolidated basis, as well as for the MOLPay segment and the "Other" geographical region.

---

[14] The April 30, 2015 final corrections differed from the December 1, 2014 corrections in three ways.  **First**, with respect to *consolidated* revenues for MOL overall, the April 30, 2015 corrections were slightly larger:  *i.e.*, the revenue figures reported in the Registration Statement were overstated to a larger degree than revealed on December 1, 2014.  *Compare* MOL's April 30, 2015 Form 6-K, at 1, to MOL's December 1, 2014 press release.  **Second**, MOL's more detailed disclosures in its April 30, 2015 Form 6-K and Form 20-F made clear that the inaccuracies in MOL's consolidated revenues stemmed wholly from improper recognition relating to MOLPay (on a product/segment basis) in MOL's "Other" geographical region (on a geographical segment basis).  *See e.g.* MOL's April 30, 2015 Form 6-K, at Ex. 99.2, at pp. 12 (explaining that improper revenue recognition affected MOL overall and MOLPay segment), 15 and 20 (demonstrating, when compared to previously-reported product segment and geographical segment revenues in the Registration Statement, that only revenues for the MOLPay product and the "Other" geographical region were overstated).  **Third**, as discussed further below, MOL also revealed on April 30, 2015 that its previously-reported financial results for Q3 2014 – which were not reported in the Registration Statement, and which were released belatedly on December 1, 2014 – had also been overstated, and MOL restated such Q3 2014 results.  *See* MOL April 30, 2015 Form 6-K, at 1 and Ex. 99.1.

**Table 1**

| The Registration Statement's False Statements Concerning Consolidated MOL Revenue and Revenue Growth | | | | | | |
|---|---|---|---|---|---|---|
| Year | Period | As Represented in Prospectus (MR) | ... at pp. | Correct (MR) | Overstatement (MR) | Overstatement (%) |
| 2013 | Q1 | 36,800,000 | 92 | 36,500,000 | 300,000 | 0.90% |
|  | Q2 | 41,900,000 | 92 | 40,700,000 | 1,200,000 | 2.90% |
|  | 1st Half | 78,740,000 | 11, 64, 80, 81, F-115, F-123, F-126, F-128 | 77,240,000 | 1,500,000 | 2% |
|  | Q3 | 45,173,000 | 92 | 44,173,000 | 1,000,000 | 2.30% |
|  | Q4 | 47,605,000 | 92 | 45,805,000 | 1,800,000 | 3.90% |
|  | FY | 171,518,000 | 2, 11, 64, 80, 85, 124, F-4, F-28, F-32, F-33 | 167,218,000 | 4,300,000 | 2.60% |
|  | Growth vs. 2012 | 79.50% | 85 | 74.91% | n/a | 6.12% |
| 2014 | Q1 | 48,625,000 | 92 | 46,357,000 | 2,268,000 | 4.89% |
|  | Q2 | 56,438,000 | 92 | 48,219,000 | 8,219,000 | 17.05% |
|  | 1st Half | 105,063,000 | 2, 11, 64, 80, 81, 124, F-115, F-123, F-125, F-128 | 94,576,000 | 10,487,000 | 11.09% |
|  | Growth vs. 1st Half 2013 | 33.40% | 81 | 22.44% | n/a | 48.81% |
| Total | 2013 and 1st Half 2014 | 276,581,000 | all the above | 261,794,000 | 14,787,000 | 5.65% |

## Table 2

### The Registration Statement's False Statements Concerning MOL's MOLPay Segment Revenue and Revenue Growth

| Year | Period | As Represented in Prospectus (MR) | … at pp. | Correct (MR) | Overstatement (MR) | Overstatement (%) |
|---|---|---|---|---|---|---|
| 2013 | Q1 | n/a | not disclosed | n/a | 300,000 | n/a |
| | Q2 | n/a | not disclosed | n/a | 1,200,000 | n/a |
| | 1st Half | 3,925,000 | 75, 81, F-123, F-126 | 2,425,000 | 1,500,000 | 61.86% |
| | Q3 | n/a (2,400,000) | not disclosed | 1,400,000 | 1,000,000 | 71.43% |
| | Q4 | n/a (3,100,000) | not disclosed | 1,300,000 | 1,800,000 | 138.46% |
| | FY | 9,412,000 | 75, 86, 138, F-28, F-32 | 5,112,000 | 4,300,000 | 84.12% |
| | Growth vs. 2012 | 307.40% | 86 | 122.26% | n/a | 151.43% |
| 2014 | Q1 | 3,968,000 | not disclosed | 1,700,000 | 2,268,000 | 133.41% |
| | Q2 | 11,259,000 | not disclosed | 3,040,000 | 8,219,000 | 270.36% |
| | 1st Half | 15,227,000 | 75, 81, 138, F-123, F-125 | 4,740,000 | 10,487,000 | 221.24% |
| | Growth vs. 1H 2013 | 287.90% | 81 | 95.46% | n/a | 201.58% |
| Total | 2013 and 1st Half 2014 | 24,639,000 | all the above | 9,852,000 | 14,787,000 | 150.09% |

26

## Table 3

### The Registration Statement's False Statements Concerning Revenues Attributed to MOL's "Other" Geographical Region

| Year | Period | As Represented in Prospectus (MR) | ... at pp. | Correct (MR) | Overstatement (MR) | Overstatement (%) |
|---|---|---|---|---|---|---|
| 2013 | Q1 | n/a | not disclosed | n/a | 300,000 | n/a |
|  | Q2 | n/a | not disclosed | n/a | 1,200,000 | n/a |
|  | 1st Half | 5,227,000 | F-128 | 3,727,000 | 1,500,000 | 40.25% |
|  | Q3 | n/a | not disclosed | n/a | 1,000,000 | n/a |
|  | Q4 | n/a | not disclosed | n/a | 1,800,000 | n/a |
|  | FY | 14,311,000 | F-33 | 10,011,000 | 4,300,000 | 42.95% |
| 2014 | Q1 | n/a | not disclosed | n/a | 2,268,000 | n/a |
|  | Q2 | n/a | not disclosed | n/a | 8,219,000 | n/a |
|  | 1st Half | 20,050,000 | F-128 | 9,563,000 | 10,487,000 | 109.66% |
| Total | 2013 and 1st Half 2014 | 34,361,000 | all the above | 19,574,000 | 14,787,000 | 75.54% |

27

### b.  Materiality

71.     The above-identified untrue statements of fact in the Registration Statement were *material*, for the reasons stated below.

72.     First, MOL's decision to *restate* its previously-reported revenues for the first half of 2014, including the first and second quarters of 2014, is an admission that previously-reported revenues for such periods were *materially* misstated.

73.     Second, in its April 30, 2015 Form 6-K, MOL asserted that its decision *not* to restate its (audited) *2013* financial statements was based on the SEC's materiality guidance as set forth in the *SEC Staff Accounting Bulletin: No 99 – Materiality* ("SAB 99").  *See* April 30, 2015 Form 6-K, at 1.  Among other things, SAB 99 discusses a 5% "rule of thumb" at which point inaccurate financial statements may be deemed *materially* inaccurate.  As Table 1 demonstrates, consolidated MOL revenues for the *entire* period at issue – 2013 in entirety and the 1st half of 2014 – were overstated by 5.65%.  This exceeds the 5% "rule of thumb" threshold for materiality identified by the SEC in SAB 99.

74.     Third, MOL's proffered explanation for its decision not to restate 2013 financial results, based in part on the sub-5% "quantitative effect of the errors" on consolidated 2013 revenues, appears belied by MOL's decision to restate Q3 2014 revenues.

    a.  As MOL revealed in its April 30, 2015 Form 6-K, MOL restated originally-reported Q3 2014 revenues of 47.702 million MR down to the correct figure of 47.166 million MR – indicating an overstatement 0.536 million MR, or 1.14%.  *See* April 30, 2015 Form 6-K, at 1.

    b.  Originally-reported 2013 revenues were overstated by an amount more than 8 times greater in absolute terms (4.3 million vs. 0.5 million MR), and more than two times greater in relative terms (2.6% vs. 1.1%) than the Q3 2014 revenues.  *See* Table 1, *supra*. Notwithstanding MOL's decision to restate the quantitatively

less-inaccurate Q3 2014 results, quantitatively more-inaccurate 2013 results were not restated.

    c.   Therefore, the quantitative principle proffered by MOL does not appear to explain which results MOL chose to restate (Q3 2014), and which results MOL declined to restate (2013).

    d.   To the extent a principle can be fitted to the facts created by MOL's restatement decisions, the *only* principle that fits is that MOL chose to restate all *unaudited* financial results (*i.e.*, results for the 1st half of 2014, as well as Q3 2014) but not to restate *audited* financial results (*i.e.*, for 2013).

75.    Fourth, SAB 99 makes clear that misstatements of less than 5% may well be material, when further contextual and/or qualitative factors indicate that such misstatements may materially alter the "total mix of information made available" to investors:

> Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality.
>
> ***
>
> Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that **there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material**; as stated in the auditing literature:
>
> **As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.**

29

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

- …

- **whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability**

- …

***

The materiality of a misstatement may turn on where it appears in the financial statements. For example**, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. "A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity" is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important. In assessing the materiality of misstatements in segment information - as with materiality generally - situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole**.

*See* SAB 99 (emphasis added, footnotes omitted)

76. Fifth, MOLPay matches exactly SAB 99's description of "a relatively small segment that is represented by management to be important to the future profitability of the entity," for which a "misstatement of revenue . . . is more likely to be material to investors . . ."

a. In the Prospectus and other public documents, Defendants identified MOLPay to be MOL's main "Growth Driver" for the years following the MOL IPO.  *See* Prospectus at 129 (setting forth MOL's "product roadmap with growth drivers"); *see also* MOL's "Company Presentation," (upon information and belief, the

presentation used by Defendants in the Roadshow) at 16 (slide titled "MOLPay driving near term growth"), 21-22 (showing "Fastest growth in MOLPay…").[15]

b. This was because MOLPay sat between (1) MOL's two larger product segments, MOLPoints and MOLReloads, whose growth prospects were limited due *inter alia* to overall market limits (*e.g.*, the market for video game credit to make in-game purchases, where MOLPoints operated), market maturity (*e.g.*, markets for pre-paid mobile airtime, where MOLReloads operated), and MOL's deeper current penetration of such markets; and (2) MOL's as-yet inoperative, in-development products meant to drive MOL growth in the more remote future, such as MOLWallet and MOLCube. *See e.g.* Prospectus at 1-2, 69, 123-24,128-29; MOL Company Presentation at 6-8, 11-12, 17-18. Therefore, given the maturity and/or market limitations of MOL's "Current Core Products," MOLPoints and MOLReloads, the burden of near-term growth for MOL rested in material part on the shoulders of MOLPay. *See e.g.* Prospectus at 129.

c. Similarly, in press interviews, Defendant Bangah repeatedly emphasized MOLPay's vital importance to MOL, for the very reasons stated in ¶ 76(a)-(b), *supra*. For example:

> MOLPay is however big business for the company and is expected to grow more rapidly than MOLPoints. Last year, MOLPay made up about 7% of total revenue but for the first six months of 2014, it has grown to make up 15% of MOL Global revenue.
>
> 'Based on this, we expect it won't take long for it to surpass [the revenue] of MOLPoints,' [Defendant Bangah] said.

See Karamjit Singh, "MOL Global now has to deliver gold to investors," *Digital News Asia*, October 13, 2014.[16] See also, Elaine Tan, "CEO: MOL going big globally, aims for US$1bil in

---

[15] Available through MOL's website at:
http://media.corporateir.net/media_files/IROL/25/253695/20141020_Company_Pres-v1.pdf.
[16] Available at: https://www.digitalnewsasia.com/insights/mol-global-now-has-to-deliver-gold-to-investors.

revenue," *The Star Online*, Feb. 9, 2013 ("'MOLPay is our fastest growing business even though it accounts for only 20% of revenues now,' [Defendant Bangah] says.").[17]

77.     Sixth, in light of the above-stated critical importance of the MOLPay segment to MOL's near-term growth, the *severity* of the overstatement of MOLPay segment revenues and growth throughout 2013 and the 1st half of 2014 (*see* Table 2) further indicates the materiality of misstatements.  Defendants represented MOLPay to be far larger, and far faster-growing, than it in fact was.  Remarkably, however, *most of the revenue and revenue growth that Defendants reported for MOLPay during 2013 and the 1st half of 2014 did not in fact exist*:

   a.  Defendants reported that MOLPay 2013 revenues were 9.4 million MR, but this overstated actual MOLPay 2013 revenues, of 5.1 million MR, by 4.3 million MR, or 84% (*see* Table 2, *supra*);

   b.  Defendants reported that MOLPay 1st half 2014 revenues were 15.2 million MR, but this overstated actual MOLPay 1st half 2014 revenues, of 4.7 million MR, by 10.5 million MR, or 221% (*see* Table 2, *supra*);

   c.  Consequently, of the 24.6 million MR of revenue that Defendants reported MOLPay to have generated during 2013 and 1st half of 2014, more than 60% -- 14.8 million MR – was phantom revenue that did not actually exist, and the correct figure for revenues during this period – 9.9 million MR – was overstated by 150% (*see* Table 2, *supra*);

   d.  Additionally, as a result of these severely-overstated revenue figures, MOLPay's revenue growth was also severely overstated.  Defendants asserted that MOLPay revenue had grown 307.4% in 2013, and 287.9% during the first half of 2014 – but the real revenue growth figures were far lower:  less than half what was originally reported for 2013 (122.3% vs. 307.4%), and less than one third of what was originally reported for 2014 (95.5% vs. 287.9%) (*See* Table 2, *supra*).

---

[17] Available at:  http://www.thestar.com.my/Business/Business-News/2013/02/09/CEO-MOL-going-big-globally-aims-for-US1bil-in-revenue/?style=biz.

    e.    Lastly, the severely-overstated figures for MOLPay made MOLPay appear to be a substantially larger part of MOL than it actually was – and, thus, more capable of carrying the near-term growth burden for MOL as a whole that Defendants had placed on it.  For example, Defendants represented that MOL revenues had grown from less than 1% of MOL's consolidated revenues in 2011 to amount to 5.5% of total revenues for 2013 and 14.5% of total revenues for the 1st half of 2014.  But these figures were false, and based on the severely-overstated revenues reported for MOL.  Instead, accurate figures reveal that MOLPay revenues made up only 3.1% of consolidated MOL revenue for 2013, and only 5.0% of consolidated revenue for the 1st half of 2014.

78.    Seventh, the materiality of the misstatements in the Registration Statement is further indicated by many of Defendants' own assertions in the Registration Statement, including:

    a.    that the secondary market trading prices for MOL ADS could by "highly volatile" due to certain factors "specific to our operations, including. . . variations in our revenue . . ." (Prospectus at 39);

    b.    that "[t]he initial public offering price of the ADSs" – as determined by MOL, MOL's officers and controlling shareholders, and the Underwriter Defendants – was based on multiple factors, including MOL's "results of operations in recent periods" (Prospectus at 205);

    c.    that MOL's officers, in order to make decisions about resource allocation and performance assessment among MOL's various segments, "monitor[ed] the operating results of its business units" by, *inter alia*, monitoring "segment revenue" (Prospectus at F-29, F-124).

79.    Eighth, confirming Defendants' above-detailed representations in the Registration Statement that the price of MOL ADS was based in material part on MOL revenues, the market's

reactions to MOL's corrective disclosures concerning its inaccurately-reported revenues further demonstrate that the matters misrepresented were material to investors and the market:

     a.   In response to MOL's November 20, 2014 disclosure (which Defendant Bangah linked to these very misrepresentations – *see* ¶ 68(b)(iii), *supra*), MOL ADS fell $4.77 per ADS, from the November 20, 2014 closing price of $8.86 per ADS to the November 21, 2014 closing price of $4.09 per ADS.

     b.   In response to MOL's December 1, 2014 disclosure, which revealed more precisely the extent of inaccuracy of MOL's previously-reported revenues, MOL ADS fell $2.40 per ADS, from MOL's frozen ADS price of $4.09 per ADS to a closing price of $1.69 per ADS on December 1, 2014, when MOL ADSs resumed trading.

     80.   Ninth and lastly, MOL and Defendant Bangah themselves attributed MOL's pre-December 1, 2014 ADS price declines (euphemistically described as "volatility") to, *inter alia*, MOL's false and overstated revenues.   MOL's December 1, 2014 press release, quoting Defendant Bangah, stated in relevant part:

> Mr. Ganesh Kumar Bangah, Chief Executive Officer of MOL, stated, "Despite some volatility in the start of our life as a public company, we are pleased to report growth for our core, e-payments platform. **The discovery of an error in the  presentation of revenue and direct costs and other ancillary expenses at our Vietnamese subsidiary as well as softness in our MMOG.asia gaming business have created volatility** that we are addressing . . . (emphasis added)

*See* MOL December 1, 2014 press release, titled "MOL Global Inc. Reports Unaudited Financial Results for the Three Month Period Ended September 30, 2014, and Other Material Developments," at 1.

### 2. Revenue Recognition

#### a. The False Statements

81.     The Registration Statement made untrue statements of material fact concerning MOL's revenue recognition policies and practices, with respect to MOL as a whole and to MOL's MOLPay segment specifically.  Such statements are identified in Table 4, *infra*.

82.     Subsequent to the IPO, MOL admitted, in the above-detailed series of disclosures stretching from November 20, 2014 to April 30, 2015 (*see* ¶¶ 68-69, *supra*) – made in MOL's November 20, 2014 and December 1, 2014 press releases, and MOL's April 30, 2015 Forms 6-K and 20-F – that revenues for MOL and MOL's MOLPay segment had been overstated throughout 2013 and the 1st half of 2014 as a result of improper revenue recognition practices at MOL's NJSC subsidiary.   These practices contravened the Registration Statement's representations concerning MOL's revenue recognition policies and practices.

83.     Put in plain terms, the matter is as follows:

   a.   MOL's main products – including MOLPoints, MOLReloads, and MOLPay – involve MOL acting as payment-processing intermediary between consumers, at one end, and merchants or service providers at the other end, including video game operators (MOLPoints), cellular telephone carriers (MOLReloads), and online merchants (MOLPay).  *See e.g.* Prospectus at 129-39.

   b.   In these product lines and operations, MOL acted as *agent* rather than principal, collecting payment from the consumer and forwarding it to the merchant or service provider – *minus MOL's fees and/or commissions*, which such fees/commissions are purportedly recognized as MOL's revenue.  (With respect to MOLPay particularly, MOL purportedly earned revenues from such transaction commissions and from one-time initiation fees paid by merchants for being able to use MOLPay).   *See e.g.* Prospectus at 13, 66, 72, 76, 86, 102, 138-39, F-17-18; *see also* at F-29, F-124.

c.  Consequently, there is a substantial difference between (1) the gross *volume* of transactions that MOL processed (where payments flowed from consumers to merchants or service providers through MOL); and (2) MOL's net *revenue* from such transactions, which consisted of MOL's fees, commissions or "revenue-sharing" portion of such processed payments.  The former is a much larger figure than the latter.   Given MOL's role as agent rather than principal in such transactions, only the latter was properly – and, per the Registration Statement, purportedly – recognized as revenue for MOL.  *See e.g.* Prospectus at 13, 66, 72, 76, 86, 102, 138-39, F-17-18; *see also* at F-29, F-124.

d.  Notwithstanding appropriate and represented accounting for such transactions, MOL's subsidiary NJSC, through which MOL operated MOLPay in Vietnam, accounted for its MOLPay transactions differently.  Acting as if it functioned as a principal rather than an agent in such transactions, NJSC recognized and reported as revenue the *gross* amount of the transaction that MOL intermediated between the consumer and merchant (*i.e.*, the full purchase price paid by the consumer, as if the consumer were paying such amount to MOL in exchange for the product), and then reported as costs the amount of such purchase price that MOL then forwarded to the merchant (*i.e.*, the full purchase price minus MOL's commission).  Similarly, NJSC also included as reported revenue the value-added tax ("VAT") that consumers were charged on their purchases, and then included such VAT as costs as MOL forwarded such VAT payments to the end merchants.  As a result of these NJSC revenue recognition practices, reported revenues in the Registration Statement for MOLPay, and MOL as  whole, were overstated throughout 2013 and the 1st half of 2014.  *See e.g.* December 1, 2014 press release; April 30, 2015 Form 6-K at 1 and Ex 99.2 at 12; Form 20-F at 15.

84.    As MOL made clear in its Form 20-F, these revenue recognition practices at NJSC (1) contravened proper, accurate and stated revenue recognition policies and practices, and

(2) resulted in substantial overstatement of the 2013 and 1st half 2014 revenue figures reported

for MOL and MOLPay in the Registration Statement:

> . . . [NJSC] reported revenue from its payment business on a gross basis, and accounted for the corresponding fees payable to merchants in direct cost and other ancillary expenses. However, our accounting policy is to account for such transactions on a net basis because we act as an agent with respect to these revenue arrangements, such that the corresponding fees payable to merchants should have been netted out of revenue and not included in direct cost and other ancillary expenses. The effect of these errors was to overstate MOLPay's segment revenue and MOLPay's segment direct cost and other ancillary expenses by equal amounts. As a result of these errors, the revenue line item and direct cost and other ancillary expenses line item in our consolidated statements of profit or loss and other comprehensive income for the three month periods ended June 30, 2013, September 30, 2013, December 31, 2013, March 31, 2014 and June 30, 2014, the six month periods ended June 30, 2013 and 2014, and the year ended December 31, 2013 included in our registration statement on Form F-1, as amended (File Number: 333-197401) in relation to our initial public offering were overstated by equal amounts. . .
>
> ***
>
> . . . [NJSC] incorrectly included VAT in revenue and direct cost and other ancillary expenses. However, our accounting policy is to exclude VAT from revenue and direct cost and other ancillary expenses. The effect of these errors was to overstate MOLPay's segment revenue and MOLPay's segment direct cost and other ancillary expenses by equal amounts. As a result, the revenue line item and direct cost and other ancillary expenses line item are overstated by equal amounts in our consolidated statements of profit or loss and other comprehensive income for the three month periods ended June 30, 2013, September 30, 2013, December 31, 2013, March 31, 2014 and June 30, 2014, the six month periods ended June 30, 2013 and 2014, and the year ended December 31, 2013 (each of which is included in our registration statement on Form F-1, as amended (File Number: 333-197401) in relation to our initial public offering), and the three months ended September 30, 2014 . . .

*See* Form 20-F at 15; *see also* December 1, 2014 press release, and April 30, 2015 Form 6-K at 1

and Ex 99.2 at 12.

85.     Table 4 below identifies the untrue statements of fact in the Registration Statement, as admitted by MOL, concerning revenue recognition policies and practices for MOL and MOLPay.

**Table 4**

## Untrue Statements of Fact in the Registration Statement Concerning Revenue Recognition

| Prospectus Page | Consolidated / Segment | Representation | Falsity |
|---|---|---|---|
| 13, 66, 72, 138 | MOLPay | "MOLPay volume is the total value of payments processed by MOLPay during a period. MOLPay volume tends to be significantly greater than MOLPay revenue, which excludes amounts paid to financial institutions." | MOLPay revenue *did not* exclude amounts paid to financial institutions, but improperly included it. |
| 76 | MOLPay | "MOLPay earns revenue from merchant fees, which are fees charged to online merchants upon their registration for MOLPay, and commissions for payments processed by MOLPay. Commissions are recognized at the time of sale. Merchant fees are recognized at the time we enter into agreements with merchants." | Reported MOLPay revenue also included, in addition to merchant fees and commissions, gross amounts paid to merchants. |
| 86 | MOLPay | "MOLPay's segment revenue increased 307.4% to MYR9.4 million for 2013 from MYR2.3 million for 2012 primarily due to increased volume resulting in higher commissions which we recognize as revenue." | Most of the increase in reported revenues and revenue growth was due not to higher commissions, but to improperly recognizing as revenue gross amounts paid to merchants. |

39

**Table 4** (continued)

| Prospectus Page | Consolidated / Segment | Representation | Falsity |
|---|---|---|---|
| 102, F-18 | MOLPay | "Revenue is based on commission and merchant fees. Commission fees are recognized when the merchants' transaction is completed. Merchant fees are recognized when a contract has been signed for the registration of a merchant in our payment system and the fee set forth in the contract becomes payable." | Reported MOLPay revenue also included, in addition to merchant fees and commissions, gross amounts paid to merchants. |
| 102, F-17 | Consolidated | "Revenue is recognized when it is probable that the economic benefits associated with the transaction will flow to us and the revenue can be measured reliably. Revenue is measured at the fair value of consideration received or receivable." | MOLPay revenue was improperly recognized and measured to include, in addition to the fair value of consideration received by MOL (the net fees to MOL), further gross amounts paid to merchants. |
| 139 | MOLPay | "MOLPay enters into agreements with online merchants which are typically for a one year term and may be terminated by either party upon 30 days' written notice. We earn revenue by charging a commission based on the purchase price, which is deducted from the amount that we remit to the online merchant. We settle payment with online merchants on a weekly basis in batches that includes payments from all applicable payment channels." | Reported MOLPay revenue also included, in addition to merchant fees and commissions, gross amounts paid to merchants. |

40

## Table 4 (continued)

| Prospectus Page | Consolidated / Segment | Representation | Falsity |
|---|---|---|---|
| F-14 | Consolidated / MOLPay | "Where necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with those used by other members of the Group." | No adjustment was made to revenue recognition policies or practices at NJSC, which were not in line with those used elsewhere in MOL or with those represented in the Registration Statement |
| 103, F-18 | Consolidated | "We [The Group] determine[s] whether we are [it is] acting as a principal or an agent by considering who is the primary obligor of the [its] arrangements and on whether we have [it has] discretion in setting prices to our [its] end users. We have [The Group] concluded that we are [it is] acting as an agent in all our [its] revenue arrangements." | Notwithstanding MOL's position as agent, revenues at NJSC were recognized in gross amounts as if MOL were acting as a principal in such transactions. |
| F-29, F-124 | Consolidated / Segment | "Segment revenue by product reported above represents revenue generated from external customers. The accounting policies of the reportable segments are the same as the Group's accounting policies described in Note 3." | Revenue recognition practices for MOLPay were not the same as the revenue recognition policies described for MOL in the Registration Statement |

41

### b.  Materiality

86.     The above-identified untrue statements in the Registration Statement concerning MOL's revenue recognition policies and practices were material for the reasons stated in Section V.C.1.b, *supra* (respecting the overstated revenues in the Registration Statement).    Revenue recognition policy/practice and revenue recognition are inextricably linked:  the former serves as the purported basis for the latter.  The revenue recognition policies and practices, as represented in the Registration Statement, indicated to investors, *inter alia*, that MOL's revenue was being *properly* recognized and reported, and that the revenues reported in the Registration Statement were only those sums described by the revenue recognition policies/practices.

### 3.     Internal Controls

87.     As defined by the Public Company Accounting Oversight Board (the "PCAOB"), internal control over financial reporting is:

> a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that –
>
> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

*See* PCAOB Auditing Standard No. 5, Appendix A (Definitions) at A5.

88.     As defined by the PCAOB, a "material weakness" in internal controls over financial reporting is:

> a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis

*See* PCAOB Auditing Standard No. 5, Appendix A (Definitions) at A7.

89.     As defined by the PCAOB, a "significant deficiency" in internal controls over financial reporting is:

> a deficiency, or a combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting

*See* PCAOB Auditing Standard No. 5, Appendix A (Definitions) at A11.

### a.  Misleading Statements

90.     As an emerging growth company under the JOBS Act, MOL was required neither to have its auditor perform an independent audit to assess MOL's internal controls over financial reporting, nor to furnish a certification from such auditor attesting to such audit (under Section 404 of the Sarbanes Oxley Act of 2002).  *See e.g.* Prospectus at 21, 40, 108, F-3.

91.     Notwithstanding such provisions of the JOBS Act, Defendants, in the Registration Statement, made affirmative representations concerning their "consideration of [MOL's] controls over financial reporting," and "two material weaknesses" found in MOL's internal controls over financial reporting, as a result of such consideration, as of December 31, 2013:

> In connection with the audit of our consolidated financial statements for the year ended December 31, 2011, 2012 and 2013, we and our independent registered public accounting firm

identified two material weaknesses in internal controls.[18] These
material weaknesses related primarily to the lack of segregation of
duties among information technology personnel and lack of access
control and audit trails over the e-pins inventory database at our
Turkish micropayment system operator, Game Sultan, and
payment service provider, PaytoGo, which we acquired in 2013.

*See* Prospectus, at 21 and 107.

92.     The representation that two "material weaknesses in internal controls" existed as
of December 31, 2013 was an untrue statement of material fact, or a materially misleading
statement.

93.     First, as revealed in MOL's Form 20-F, neither of the two material weaknesses
described in the Registration Statement related to the improper revenue recognition practices at
NJSC (*see* Section V.C.2, *supra*) that led to material overstatement of reported revenues (*see*
Section V.C.1, *supra*).  *See* MOL Form 20-F, at 13.  However:

a.     as MOL admitted in its Form 20-F, improper revenue recognition practices at
NJSC indeed constituted a material weakness.  *See* MOL Form 20-F, at 13 ("In
addition, a material weakness was identified at NganLuong [NJSC], our Vietnam
subsidiary which we acquired in 2013, relating to the incorrect reporting of fees
payable to merchants and the incorrect reporting of VAT.");

b.     the above-identified material weakness at NJSC existed not only as of December
31, 2014 (as stated in the Form 20-F), but also existed as of December 31, 2013 –
a time at which, per Defendants' representation, only two other material
weaknesses existed;

---

[18] As Defendants further clarified in the Registration Statement, although MOL's auditors were not required to
perform an audit on the effectiveness of MOL's internal controls over financial reporting, and, accordingly
"express[ed] no such opinion," the audit of MOL's financial statements for the years ended December 31, 2013,
2012 and 2011 nevertheless "included consideration of internal control over financial reporting" and led MOL and
its auditor to identify two specific "material weaknesses."   *See* Prospectus, at 21 and F-3.   Additionally,
notwithstanding the absence of auditor audit and attestation as to the effectiveness of MOL's internal controls (per
the JOBS Act), MOL's auditor still provided a signed opinion that MOL's audited financial statements for 2013,
2012 and 2011 were materially accurate.   See Prospectus, at F-3 ("In our opinion, such consolidated financial
statements presents fairly, in all material respects, the financial position of the MOL Global, Inc. and subsidiaries as
of December 31, 2011, 2012 and 2013 and the results of their operations and their cash flows for the years ended
December 31, 2011, 2012 and 2013, in conformity with International Financial Reporting Standards as issued by the
International Accounting Standards Board.")

c.  consequently, as of December 31, 2013, there were at least 3 material weaknesses in MOL's internal controls, including the two described in the Registration Statement and the material weakness at NJSC.

94.  Second, as MOL admitted in its Form 20-F, MOL in fact had at least *seven* material weaknesses in internal controls over financial reporting (as of December 31, 2014):

> In connection with the audit of our consolidated financial statements for the year ended December 31, 2014, we and our independent registered public accounting firm identified seven material weaknesses in our internal control over financial reporting continue to exist.
>
> The first material weakness is that our SAP system and our MLogin system do not reconcile revenue recognized by MOL AccessPortal upon the redemption of the MOLPoints and deferred revenue for unutilized MOLpoints that remain in users' MOLPoints wallets. The second material weakness relates to the IT general control environment, which includes design and operating effectiveness of IT controls, of MOL AccessPortal, MyCNX and Uniwiz, in addition to the lack of segregation of duties of IT personnel at Game Sultan and PaytoGo. The third material weakness relates to the lack of access control and audit trails over the e-pins inventory database. Three material weaknesses were identified at PayByMe, the mobile carrier billing platform that we acquired in September 2014, namely (a) the lack of documentation for journal entries and inadequacy of human resources for consistent financial reporting on a timely basis; (b) lack of reconciliation of confirmation processes with respect to current accounts; and (c) the lack of an internal control department. In addition, a material weakness was identified at NganLuong, our Vietnam subsidiary which we acquired in 2013, relating to the incorrect reporting of fees payable to merchants and the incorrect reporting of VAT.

*See* Form 20-F, at 13.

95.  Third, of the seven above-mentioned material weaknesses admitted by MOL  in its Form 20-F to exist as of December 31, 2014, *all seven existed at the time the Registration Statement became effective, on October 8, 2014*:

a. The second and third of the seven material weaknesses match the two material weaknesses disclosed by MOL in the Registration Statement, thus existed at the time the Registration Statement became effective – and were disclosed in the Registration Statement;

b. The seventh of the seven material weaknesses is the improper revenue recognition at NJSC that led to false and overstated reported revenues in the Registration Statement, and thus necessarily existed at the time the Registration Statement became effective – but was not disclosed in the Registration Statement; and

c. The remaining four material weaknesses were not identified or mentioned in the Registration Statement.

d. However each of these four material weaknesses not mentioned in the Registration Statement was in fact operative within MOL at the time the Registration Statement became effective:

    i. Three of these four material weaknesses were ones "identified at PayByMe, the mobile carrier billing platform that we acquired in September 2014." *See* Form 20-F, at 13.[19] As PayByMe was acquired by MOL in September 2014 – *i.e.*, *prior* to MOL's IPO – these three PayByMe material weaknesses were operative within MOL at the time of the IPO. Indeed, the Prospectus explicitly mentions MOL's acquisition of PayByMe as one of several "Significant Events Subsequent to the End of the Reporting Period." *See* Prospectus, at F-137; *see also id.* at 4, 59 (mentioning PayByMe acquisition).

    ii. The remaining material weakness – "that our SAP system and our MLogin system do not reconcile revenue recognized by MOL AccessPortal upon

---

[19] These three material weaknesses were, specifically: "(a) the lack of documentation for journal entries and inadequacy of human resources for consistent financial reporting on a timely basis; (b) lack of reconciliation of confirmation processes with respect to current accounts; and (c) the lack of an internal control department." *See* Form 20-F, at 13.

the redemption of the MOLPoints and deferred revenue for unutilized MOLpoints that remain in users' MOLPoints wallets" (*see* MOL Form 20-F, at 13) – was not a new matter arising from a new product, but rather a longstanding matter relating to MOL's oldest and largest product, MOLPoints.

96.     Consequently, the Registration Statement's representations that, after "consideration of internal controls over financial reporting" only "two material weaknesses" in internal controls  existed, was either:

    a.  an untrue statement of fact, as MOL had at least seven material weaknesses in internal controls at the time the Registration Statement became effective, including but not limited to the material weakness relating to revenue recognition at NJSC; or

    b.  a misleading statement, in light of the omission of at least five further material weaknesses in internal controls that then also existed at MOL, including but not limited to the material weakness relating to revenue recognition at NJSC.

### b.  Materiality

97.     The misrepresentations and/or misleading statements concerning MOL's material weaknesses in internal controls were material.

98.     First, they related directly to the material misrepresentations identified in Sections V.C.1-2, *supra*:  namely, MOL's reported revenues, and MOL's stated revenue recognition policies and procedures.  Specifically, the Registration Statement omitted any mention of material weaknesses at NJSC.  That very material weakness allowed revenue to be recognized improperly and in contravention of stated revenue recognition policies, and therefore resulted in the reporting of materially-overstated revenues for MOL and its MOLPay segment throughout 2013 and the 1st half of 2014.

99.     Second, as the misrepresentations concerned "*material* weaknesses" (emphasis added) in internal controls, such misrepresentations were material *a priori* and by definition, given the link between material weaknesses and reasonable possibility of material misstatement of financial results.

100.    Third and relatedly, as Defendants themselves admitted, the presence of material weakness in MOL's internal controls, and/or disclosure of such material weaknesses to the public, could "cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of ADS." *See* Prospectus, at 21.

**D.      Omissions from the Registration Statement**

101.    As detailed below, Defendants omitted material facts from the Registration Statement that:  (a) they were required to make pursuant to regulations governing the preparation of such documents (set forth in Section V.D.1, *infra*), and (b) that were necessary to render other statements made by Defendants in the Registration Statement not misleading.

**1.    Applicable Disclosure Requirements**

102.    The form and content of registration statements are governed by numerous regulations promulgated pursuant to the Securities Act.  Among other things, these regulations, as well as the SEC's instructions for specific forms of registration statements, set forth specific disclosure requirements with respect to such documents.  *See e.g.* Regulation S-K, 17 C.F.R. §§ 229.10 *et seq.* (disclosure requirements for non-financial statement portions of registration statements and other filings); Regulation S-X, 17 C.F.R. 210.1-01 *et seq.* (requirements concerning the form and content of financial statements included with registration statements and other filings); Regulation C, 17 C.F.R. §§ 230.401 *et seq.* (general requirements concerning registration process and disclosure format and presentation for registration statements);  and SEC general instructions for Forms F-1 and 20-F, 17 C.F.R. § 249.220 (specifying disclosures required of foreign private issuers using such forms).

103.    Pursuant to such regulations, a registration statement must expressly disclose:

a.   Audited financial statements for each of the three most recent fiscal years (or, in the case of emerging growth companies and pursuant to the JOBS Act, the two most recent fiscal years). *See* 17 C.F.R. § 210.3-02; SEC Form F-1 instructions at Item 4; SEC Form 20-F instructions at Items 8, 17 and 18.

b.   Updated, unaudited financial statements for interim quarterly periods between (1) the end of the most preceding fiscal year, and (2) the date the registration becomes effective, so that such interim financial statements cover a period ending no more than 135 days prior to the date the registration statement becomes effective. *See* 17 C.F.R. § 210.3-12.

c.   When such registration statement becomes effective more than nine months after the end of the last audited fiscal year, interim financial statements covering at least the first six months of the current fiscal year. *See* SEC Form 20-F instructions at Item 8.A.5 and Form F-1 instructions at Item 4.a.

104.   Additionally, and pursuant to such regulations, a registration statement must also disclose further information, including:

a.   "Additional Information," if any, required in certain circumstances pursuant to 17 C.F.R. § 230.408:

In addition to the information expressly required to be included in a registration statement, there be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made, not misleading.

*See* 17 C.F.R. § 230.408.

b.   Further information concerning "Significant Changes," if any, since the date of the most recent interim financial statements included in the registration statement, pursuant to SEC Form 20-F instructions at Item 8.B:

**Significant Changes**.   Disclose whether or not any significant change has occurred since the date of the annual financial

statements, and/or since the date of the most recent interim financial statements, if any, included in the document.

*See* SEC Form 20-F instructions at Item 8.B and Form F-1 instructions at Item 4.a.

105.   Here, while the Registration Statement contained the disclosures expressly required pursuant to ¶ 103, *supra* (namely, audited financial statements for 2012 and 2013; and interim financial statements for the first two quarters of 2014), Defendants negligently omitted to disclose in the Registration Statement additional information required pursuant to ¶ 104, *supra* (namely, interim financial statements for the third quarter of 2014).

## 2.   Omission of MOL's Financial Results for the Third Quarter of 2014

106.   The third quarter of 2014 ended on September 30, 2014.

107.   Eight days later, on October 8, 2014, the Registration Statement for MOL's IPO became effective.  MOL's IPO was completed, and the final Prospectus for the IPO was dated, the following day:  October 9, 2014.

108.   Once the third quarter of 2014 had ended, Defendants either (1) knew and negligently failed to disclose, or (2) absent negligence, should have known and disclosed MOL's financial results for the third quarter of 2014, or information concerning where such results were heading.

109.   As detailed immediately below in Section V.D.3, *infra*, such information (*i.e.*, MOL's financial results for the third quarter of 2014 or the direction in which such financial results were heading):

    a.   was material;

    b.   was necessary to make certain required statements in the Registration Statements – specifically, MOL's financial results for older periods, including 2012, 2013 and the first half of 2014 – in light of the circumstances under which they were made, not misleading;

      c.   constituted a "significant change" from the financial results for prior periods disclosed in the Registration Statement (*i.e.*, 2012, 2013 and the first half of 2014); and

      d.   consequently, required disclosure in the Registration Statement pursuant to, *inter alia*, 17 C.F.R. § 230.408 and SEC Form 20-F instructions at Item 8.B and Form F-1 instructions at Item 4.a.

110.    Such information was knowable to Defendants, absent negligence, prior to and/or at the time the Registration Statement became effective.

111.    Absent this information, Defendants' disclosures in the Registration Statement concerning MOL's financial results, limited as they were to older periods (*i.e.*, 2012, 2013 and the first half of 2014), were materially incomplete and materially misleading.

### 3.    Materiality

112.    The MOL financial results disclosed in the Registration Statement consisted of:

      a.   annual results – for 2011, 2012 and 2013;

      b.   semi-annual results – for the first half of 2013 ("1H 2013"), the second half of 2013 ("2H 2013"), and first half of 2014 ("1H 2014"); and

      c.   quarterly results – for the third and fourth quarters of 2013, all four quarters of 2013, and the first and second quarters of 2014.

*See* Prospectus at, respectively: (a) F-30-32; (b) F-125-26; and (c) 92.

113.    Each set of the results disclosed in the Registration Statement (annual, semi-annual and quarterly), compiled in Annex A hereto, indicated that MOL as a whole, and most of MOL's segments (1) was experiencing sharp growth in revenue and profit, and (2) that such growth had continued through the most recent period disclosed (*i.e.* for annual results, 2013; for semi-annual results, 1H 2014; and for quarterly results, Q2 2014). *See* Annex A at Table 5 (annual results), Table 6 (semi-annual results) and Table 7 (quarterly results).

114.    For example, and to illustrate:

a.   the annual results indicated, *inter alia*:

    i.   that MOL's consolidated revenues grew 51.2% in 2012 (vs. 2011), and 79.5% in 2013 (vs. 2012), and that MOL's consolidated profits, though declining slightly in 2012 (down 9.6% vs. 2011), grew by 110.7% in 2013;

    ii.   that MOLPoints segment revenues increased 89.6% in 2012 and 76.1% in 2013, accompanied by segment profit increases of 61.4% in 2012 and 52.7% in 2013;

    iii.   that MOLPay segment revenues increased by 263.5% in 2012, and again by 307.4% in 2013;

    iv.   that MMOG.asia segment revenues rose from zero in 2011 to MR 3.58 million in 2012 to MR 23.72 million in 2013 (*i.e.*, revenue growth of 561.7% in 2013), and that segment profits likewise rose from zero in 2011 to MR 1.29 million in 2012 to MR 6.63 million in 2013 (*i.e.*, profit growth of 414.2% in 2013);

b.   the semi-annual results indicated, *inter alia*:

    i.   that MOL was experiencing substantial, consistent and continuing revenue growth:   2H 2013 revenues grew 17.8% vs. 1H 2013; and 1H 2014 revenues grew 13.2% on a sequential basis (*i.e.*, vs. 2H 2013) and 33.4% on a year-over-year basis (*i.e.*, vs. 1H 2013);

    ii.   that MOL was experiencing substantial, consistent and increasing profit growth:  2H 2013 profits of MR 10.2 million marked a 6.7% increase over 1H 2013 profits of MR 9.6 million; and 1H 2014 profits of MR 15.9 million exhibited sequential growth of 55.5% (vs. 2H 2013) and year-over-year growth of 65.8% (vs. 1H 2013);

    iii.   that the MOLPay segment was experiencing skyrocketing revenues and revenue growth: 2H 2013 revenues of MR 5.49 million grew 17.8% vs. 1H 2013 revenues of MR 3.93 million; while 1H 2014 revenues of MR

15.23 million grew 177.5% on a sequential basis (*i.e.*, vs. 2H 2013) and 287.9% on a year-over-year basis (*i.e.*, vs. 1H 2013); and

c.   the quarterly results indicated, *inter alia*:

   i.   substantial and continuing revenue growth for MOL as a consolidated whole, both on a sequential basis (each quarter between Q1 2013 and Q2 2014 featuring, on average, more than 9% more revenue than the immediately preceding quarter) and on a year-over-year basis (*e.g.*, Q1 and Q2 2014 revenues showing respective growth over the year-ago quarters, Q1 2013 and Q2 2013, of 32.1% and 34.7%);

   ii.   substantial profit growth for MOL as a consolidated whole on a year-over-year basis (*e.g.*, Q1 and Q2 2014 profit showing respective growth over the year-ago quarters, Q1 2013 and Q2 2013, of 52.7% and 135.7%);

   iii.   skyrocketing revenue growth in the MOLPay segment, on both a sequential and year-over-year basis, rising, sequentially, 29.2% in Q4 2013 (from MR 2.4 million to MR 3.1 million), 28.0% in Q1 2014 (to MR 3.97 million), and 182.7% in Q2 2014 (to MR 11.2 million).

*See* Annex A at, respectively, Tables 5, 6 and 7.

115.   MOL's financial results for the third quarter of 2014, however, *departed* from – and, indeed, *reversed* – the above-indicated trends.  *See* Annex A at Table 7.  For example:

a.   Consolidated MOL revenues for the quarter, which had heretofore risen on average 9% over the past 6 quarters sequentially, instead declined by 15.5% (and, as compared with the year-ago quarter, featured minimal growth of only 5.6% vs. extant year-ago quarterly growth rates averaging 33%).  *See* Annex A at Table 7 and ¶ 114(c)(i), *supra*;

b.   Consolidated MOL profits for the quarter had not only decreased substantially on a sequential basis (50% below Q2 2014 profits and nearly 70% below Q1 2014 profits), but, instead of showing consistently sharp year-over-year profit growth

enjoyed in Q1 2014 and Q2 2014 (respectively, growth of 52.7% and 132.7% vs. Q1 and Q2 2013), betrayed a sharp decline of 65.3% versus the year-ago quarter. *See* Annex A at Table 7 and ¶ 114(c)(ii), *supra*;

c.  Skyrocketing revenue growth in the MOLPay segment, which had risen as much as 182.7% on a quarter over quarter basis, was revealed to be fictional and founded in largest part on sums improperly recorded as revenue (per Section V.C, *supra*), and when only sums properly recognizable as revenue were recorded for Q3 2014, Q3 2014 revenues fell 67.9% from inflated Q2 2014 levels. *See* Annex A at Table 7 and ¶ 114(c)(iii), *supra*.

116.   The departure of the Q3 2014 financial results from the financial results contained in the Registration Statement, and the former's reversal of the trends indicated by the latter, were material (1) not only in and of themselves, but (2) also with respect to what they indicated concerning MOL's future.  Specifically, the Q3 2014 results indicated that the positive trends displayed by the financial results disclosed in the Registration Statements might no longer be continuing, and, to the contrary, could be reversing course.

117.   Most concretely, the Q3 2014 results raised a new and important question as to which of two materially diverging paths MOL would follow:  (1) resumption of the favorable trends indicated by the Registration Statement's financial results; or (2) adoption of the new and far less favorable trend indicated by the Q3 2014 results.

118.   Indeed, as contemporary news reports quoting market participants reveal, this was the spirit with which investors and the market greeted MOL's financial results for the third quarter of 2014 after such results were belatedly disclosed on or about December 1, 2014:

**MOL Global Continues to Face Investor Backlash**

- **Q3 numbers raise concerns of possible weak Q4**
- **Company says 'errors' were made on some financial data**

MOL Global Inc., an e-payments company based in Malaysia, continued to fact the backlash of disappointed investors as its share

price plunged more than 80% from the opening price on its Nasdaq debut on Oct. 9, 2014.

Trading of the company's shares which were halted on Nov. 24, resumed on Monday (Dec. 1), and tumbled by 58.8% to US$1.69 per share, with more than 9.3 million shares changing hands.

 Based on Monday's closing price on the Nasdaq Global Market, MOL Global's market capitalisation [sic] has depreciated by a staggering US$435 million (RM 1.43 billion) since its initial public offering (IPO). . .

\* \* \*

**A look at the numbers**

For the first nine months of this year, MOL Global registered a net profit (attributable to shareholders) of RM 13.62 million, a 19% increase from the RM 11.39 million in the same period a year ago. Revenue went up 15% to RM 143.45 million.

While these figures paint a rosy picture, *industry observers are more concerned about the third quarter numbers.*

*For the third quarter ended Sept. 30, 2014, net profit fell by 60% to RM 2.43 million, versus RM 6.3 million in the third quarter of last year.  Revenue rose 5% to RM 47.7 million during the same period.*

*'I think investors are concerned that the same trend could be repeated in the fourth quarter,' said the head of research at a Malaysian-based brokerage, who preferred anonymity.*

MOL Global attributed the lower third quarter earnings to the lower gross profit contribution from MMOG.asia and higher employee expenses.

During the third quarter, MMOG.asia's segment revenue suffered a 36.7% decline to RM 3.9 million, from RM 6.2 million in the same quarter last year. .  .

The third quarter also saw an increase in MOL Global's operating expenses by 8.1% to RM 20.8 million, mainly driven by higher employee expenses.

**Errors in Vietnamese subsidiary's numbers**

> The company also announced that there were 'certain errors' in revenue as well as direct cost and other ancillary expenses in its consolidated statements for the six months ended June 30, 2013 and June 30, 2014; the three months ended March 31, 2014 and June 30, 2014; as well as the financial year ended Dec. 31, 2013. . .

*See* Goh Thean Eu, "MOL Global continues to face investor backlash," *Digital News Asia*, December 3, 2014 (bold in original; italics added for emphasis).[20]

119.   Indeed, and as indicated in substantial detail in Annex A, the Q3 2014 financial results in fact marked a material turning point in MOL results of operations, as (1) the favorable trends evident in the Registration Statement's financial results (for periods between 2011 and 1H 2014), were replaced by (2) the negative trends first indicated in the Q3 2014 results, which continued in subsequent periods.  Specifically:

a.   Annual results for 2014 largely and sharply reversed the positive financial trends exhibited by MOL's annual results for 2011, 2012 and 2013 (disclosed in the Registration Statement).  For example:

i.   Consolidated MOL revenues grew by 18% in 2014, far less than the 79.5% and 51.2% growth in 2013 and 2013;

ii.   Consolidated MOL profits declined by 187% in 2014, and were transformed into substantial losses, standing in sharp contrast to the profits generated each year between 2011 and 2013 and the 110.7% growth in profits in 2013;

iii.   Analogous profit declines prevailed in MOL's two largest segments, MOLPoints and MOLReloads, where 2014 profits fell, respectively, 40.3% and 35.5% (after having grown 45.4%-61.4% during 2012 and 2013); and

iv.   2014 revenues in the MOLPay and MMOG.asia segments reversed course, with MMOG.asia revenues declining by 46.6% in 2014 (after having

---

[20] Available at:  http://www.digitalnewsasia.com/sizzle-fizzle/mol-global-continues-to-face-investor-backlash.

grown 414.2% in 2013), and with MOLPay revenues growing by only 16.4% in 2014 (less than one-fifteenth of the growth rates in prior years – 263.5% in 2012 and 307.4% in 2013).

b. Semi-annual results for 2H 2014 largely and sharply reversed the positive financial trends exhibited by MOL's semi-annual results for 1H 2013, 2H 2013 and 1H 2014 (disclosed in the Registration Statement).  For example:

    i. Consolidated MOL revenues grew sequentially only 3.4% in 2H 2014 (versus sequential growth in 1H 2014 and 2H 2013 that averaged 15.5%) and only 17.1% on a year-over-year basis (only half of the 33.4% year-over-growth during 1H 2014);

    ii. Consolidated MOL profits declined by 310% in 2H 2014, and were transformed into substantial losses, standing in sharp contrast to the profits and profit growth generated during each of the 3 prior semi-annual periods (1H 2014, 2H 2013, 1H 2013);

    iii. 2H 2014 revenues in the MOLPay segment reversed course, declining 55% on a sequential basis (vs. 1H 2014), in sharp contrast to prior sequential growth rates of 177.5% and 39.8% during the preceding semi-annual periods, and growing only 23.9% on a year-over-year basis (less than one-tenth the prior year-over-year growth rate of 287.9%).

c. Quarterly results for Q3 and Q4 2014 largely and sharply reversed the positive financial trends exhibited by MOL's quarterly results for the prior eight quarters from Q3 2012 to Q2 2014 (disclosed in the Registration Statement), as set forth in ¶¶ 114(c)-115, *supra*.

*See* Annex A at Tables 5, 6 and 7.

120.     Telescoping the multiple periodicities (annual, semi-annual, and quarterly) in the above analysis reveals that the turning point in MOL's fortunes was, specifically, Q3 2014.  As summarized above and detailed in Annex A:  (a) 2014 diverged negatively from 2011, 2012 and

2013; (b) 2H 2014 diverged negatively from 1H 2014, 2H 2013 and 1H 2013; and (c) Q3 and Q4 2014 diverged negatively from the prior 8 quarters (Q3 2012 through Q2 2014).   As the periodicity moves from widest (annual) to narrowest (quarterly), the precise turning point for the broader periods is increasingly brought into focus.   Specifically, 2014 diverged negatively from prior years *because of worse performance in 2H 2014* (evident in the semi-annual comparisons, where 2H 2014 diverged negatively from 1H 2014, 2H 2013 and 1H 2013), and 2H 2014 diverged negatively from prior semi-annual periods *because of poor performance first evident in Q3 2014* (evident in the quarterly comparisons, which show how Q3 2014 – followed by Q4 2014 – diverged negatively from prior quarters).

121.    In short, the financial results disclosed in the Registration Statement, for periods between 2011 and 1H 2014, all indicated a continuing positive trend in MOL's operations and results, while the financial results omitted from the Registration Statement, for Q3 2014, indicated that such positive trend had been discontinued and replaced with a new, different and negative trend.

122.    Consequently, as result of the foregoing, MOL's Q3 2014 financial results constituted "further material information," pursuant to 17 C.F.R. § 230.408, "necessary to make the required statements [*i.e.*, the financial results disclosed in the Registration Statement], in the light of the circumstances under which they were made, not misleading," and Defendants' omission of MOL's Q3 2014 results was a material omission that rendered the Registration Statement materially misleading.

123.    Similarly and for the same reasons, MOL's Q3 2014 financial results constituted a "significant change," pursuant to SEC Form 20-F instructions at Item 8.B and Form F-1 instructions at Item 4.a, that required disclosure in the Registration Statement, and Defendants' omission of MOL's Q3 2014 results was a material omission that rendered the Registration Statement materially misleading.

E. **Post-IPO Corrective Disclosures Reveal the Registration Statement's Material Misrepresentations and Omissions, Causing Material Declines in MOL ADS Value**

124.    Between the IPO and the series of corrective disclosures beginning on November 20, 2014 detailed below, MOL made no material disclosures.   Consequently, the only information concerning MOL that was available to investors and the Class, at all times between the IPO and November 20, 2014, was the disclosures provided by Defendants in the Registration Statement.

125.    On November 20, 2014 – and only hours prior to MOL's below-discussed disclosures at 4:01 PM on November 20, 2014 – Deutsche Bank analysts Alan Hellawell III ("Hellawell") and Vivian Hao ("Hao") issued an analyst report on MOL.   The first and only analyst report on MOL during the Class Period, the Deutsche Bank report, titled "Payments Champion to the Developing Markets," initiated coverage of MOL with a "Buy" recommendation and a price target of $12.00 per ADS, explaining:

> We initiate coverage on MOL with a Buy recommendation in the expectation that this leader in offline-to-online (O2O) payments will enjoy strong secular growth in the many developing markets it covers. We view new product lines as paving the way for the company to accommodate SE Asia's eventual move from O2O to fully online payments. . .

126.    By the close of trading on November 20, 2014, MOL ADSs advanced to their highest closing price since the IPO, rising from their November 19, 2014 closing price of $8.03 per ADS to $8.86 per ADS at the November 20, 2014 close.

## 1. The November 20, 2014 Corrective Disclosure

127.    MOL had been scheduled to release Q3 2014 results on the morning of November 21, 2014.   *See* November 11, 2014, MOL press release, titled "MOL Global to Announce Third Quarter 2014 Financial Results" (announcing that MOL "plans to release its third quarter 2014 financial results on Friday, November 21, before the market opens").

128.    At 4:01 PM on November 20, 2014 – just after the market closed for the day, and less than 24 hours prior to its previously-scheduled release of third quarter 2014 financial results – MOL issued a press release titled "MOL Global Inc. Announces Schedule Change for Third Quarter 2014 Financial Results and Management Changes."  In it, MOL announced:

   a.   that it had "rescheduled the date it plans to release its third quarter 2014 results to Wednesday, December 3, 2014" (a two-week delay from the originally-scheduled release date of November 21, 2014); and

   b.   that Defendant Wong had "tendered his resignation as the Group Chief Financial Officer for the Company, effective immediately" – purportedly for "personal reasons."

129.    Defendant Bangah subsequently admitted, in a December 1, 2014 conference call with MOL analysts and investors, that MOL's November 20, 2014 announcement was occasioned by, and thus related to, the accounting errors that had inflated MOL's previously-reported financial results:

> BANGAH:  To begin with we sincerely apologize to all of our investors for the delay in our earnings announcement for the third quarter.  The recent discovery of the accounting error at our Vietnamese subsidiary forced us to delay the announcement in order to properly understand the issue, rectify it, and be able to provide our shareholders with a clear picture of the situation.[21]

130.    In response to MOL's November 20, 2014 announcements, Deutsche Bank analysts Hellawell and Hao, who only hours earlier had issued an inaugural and positive report on MOL with a "Buy" rating (*see* ¶ 125, *supra*), "rushed out a follow-up after the [MOL] announcement, stepping back from their bullish calls."  *See* Shuli Ren, "Caution!  MOL Global's CFO Resigns 1 Month After IPO," *Barron's Asia*, November 21, 2014.[22]  Specifically, in a November 21, 2014 "Note" containing an updated view in light of MOL's November 20, 2014

---

[21] *See* December 1, 2014 MOL 3rd Quarter 2014 Earnings Conference Call (audio recording) at 1:56 to 2:16, available at:  http://ir.mol.com/phoenix.zhtml?c=253695&p=irol-presentations.
[22] Available at:  http://blogs.barrons.com/asiastocks/2014/11/21/caution-mol-globals-cfo-resigns-1-month-after-ipo/.

announcements, the Deutsche Bank analysts now "advise[d] caution around [MOL] shares" in light of MOL's "potentially ominous" November 20, 2014 disclosures. The Note's contents were also reiterated in the November 24, 2014 issue of Deutsche Bank's "Scene in the Straits" market research report, collecting recent Deutsche Bank commentary on investment strategies for Asian markets and companies.

131.    Deutsche Bank's November 21, 2014 Note, expressing "concern with what factors might have driven both of these *material* developments" (emphasis added), and acknowledging that MOL's November 20, 2014 disclosure "lack[ed] specific detail around said factors," *immediately linked MOL's November 20, 2014 disclosures to potential "erroneous reporting" stemming from "poor" internal controls* (a linkage Defendant Bangah admitted post facto – *see* ¶ 129, *supra*). As Deutsche Bank's November 21, 2014 Note and November 24, 2014 Straits Report stated:

> **Major developments at company in wake of recent DB initiation** - MOL management last night announced that it would postpone its planned 3Q results call from 9pm HK time today (Friday, Nov 21) to Wednesday, Dec 3, 9pm HK time. The company also announced the resignation of Allan Wong due to "personal reasons.". . .  Having just initiated coverage on the company with a Buy recommendation, we would however advise caution around the shares until further detail is disclosed around the reasons for these changes. Although, we maintain our long term positive view and Buy on MOL given the significant growth potential of payments in the developing markets.

> **Sudden announcement potentially ominous, lacking further detail** - *We are concerned with what factors might have driven both of these material developments, but lack specific detail around said factors. As a result we would advise caution near term. We would only add that MOL, as a relatively small company which spans more than 13 markets, could suffer from poor internal reporting systems*, rendering a representation of the business challenging until the actual closing of books at the end of reporting periods. We also note that MOL, with 454 employees, has undertaken no less than 10 investment and acquisitions in five countries since 2009. . .  The company as a result of its aggressive investment program *might theoretically face increased risk of delayed or erroneous reporting from affiliates and subsidiaries* . . .

*See e.g.* November 24, 2014 Straits Report, at 4 (bold in original, italics added)

132.    Deutsche Bank's above-detailed responses to MOL's November 20, 2014 disclosures indicate that such disclosures were:

> a.    *material*, as they caused Deutsche Bank analysts to alter their investment opinion and views concerning MOL; and
>
> b.    understood by market participants, in real time, to have resulted from and indicate problems with MOL's internal controls and potential "erroneous" financial reporting.

133.    Consequently, market reaction to MOL's post-close November 20, 2014 disclosure was strong and negative.  MOL ADSs, which had closed trading prior to the disclosure at $8.86 per ADS on November 20, 2014, lost more than half their value by the time trading closed on November 21, 2014 – declining $4.77 per ADS to close at $4.09 per ADS. More than 6.1 million MOL ADSs were transacted during the day's trading:  more than 25 times the average post-IPO daily trading volume of 228,000 ADS until that time (*i.e.*, between October 10, 2014 and November 20, 2014).

134.    Subsequently, on or about November 25, 2014, Deutsche Bank announced it was suspending its research coverage of MOL, including its "Buy" rating and its ADS price estimate of $12.00 per ADS:

> until further clarity can be provided regarding the company's announcement last Friday regarding the delayed reporting of 3Q results and the resignation [of] MOL Group's CFO.

> **2.    November 24, 2014:  As Trading in MOL ADS is Halted Pending Further Information Requested from MOL, MOL Investors File Suit Alleging Securities Act Violations**

135.    On Monday November 24, 2014, Nasdaq – having asked MOL for more information in light of MOL's November 20, 2014 disclosures, and not having received it – announced that it had halted all farther trading in MOL ADSs "until MOL Global Inc. has fully satisfied Nasdaq's request for additional information."  *See* Nasdaq November 24, 2014 release

titled "Nasdaq Halts MOL Global Inc."  The halt took effect approximately 10 minutes into the day's trading, at 9:10 AM Eastern Time, freezing MOL ADS at their "last price" of $4.09 per ADS (their closing price as of November 21, 2014).  *Id.*

136.   Trading did not resume for the entire week:  from Monday November 24, 2014 through Friday November 28, 2014.  During this time, MOL's only further disclosure was a November 25, 2014 press release, titled "MOL Global Inc. Announces Schedule Change for Third Quarter 2014 Financial Results," which rescheduled the results release in question from December 3, 2014 to "before [the] market opens" on December 1, 2014.

137.   On November 24, 2014, as MOL ADS trading was halted, MOL investors filed the first of several lawsuits alleging Securities Act violations by MOL, certain of the Individual Defendants, and the Underwriter Defendants.  At the time of initial suit filing, MOL's most recent price was its then-frozen closing price as of November 21, 2014:  $4.09 per ADS.

138.   However, the $4.09 *price* – one at which MOL ADSs had been frozen pending "additional information" from MOL – did not reflect the *value* of MOL ADSs at that time.  Instead, the value of MOL ADSs was substantially *less* than their frozen market price – as is demonstrated by the market's reaction to the "additional information" that MOL subsequently provided, and that allowed MOL ADSs to resume trading, on December 1, 2014.

### 3.     The December 1, 2014 Corrective Disclosure

139.   On the morning of December 1, 2014, before the market opened, MOL issued a press release, and hosted a conference call with analysts and/or investors, disclosing:

    a.  the results for its 3rd quarter of 2014 – including substantial revenue and profit declines at MMOG.asia; only marginal revenue growth, and profit declines, for its "current core" products MOLPoints and MOLReloads; and, consequently, marginal revenue growth and substantial profit declines for MOL overall – whose release MOL had previously delayed on November 20, 2014 as a result of finding accounting errors affecting MOL's historical results; and

     b.  that MOL's previously-reported revenues for 2013 and the 1st half of 2014 had been inflated due to improper revenue recognition at NJSC, and that corrected revenues for such periods were substantially less.

140.  MOL's December 1, 2014 disclosures thus served as corrective disclosures with respect to the Registration Statement's:

     a.  untrue statements of material fact concerning MOL revenues for 2013 and the 1st half of 2014;

     b.  untrue statements of material fact concerning MOL's revenue recognition policies and procedures; and

     c.  omission of MOL's Q3 2014 results.

141.  Additionally, MOL's December 1, 2014 disclosures provided indication that MOL's internal controls over financial reporting were in poorer shape than previously reported, and that they suffered from additional "material weaknesses," such as revenue recognition at NJSC, than those disclosed in the Registration Statement.

142.  Coincident with MOL's December 1, 2014 disclosures, Nasdaq lifted the trading halt on MOL ADS, thereby allowing market prices for MOL ADS to evaluate and reflect MOL's December 1, 2014 disclosures.  By the end of the December 1, 2014 trading day, MOL ADSs lost $2.40 per ADS of their remaining value, falling from $4.09 per ADS (their closing price as of November 21, 2014) to close at $1.69 per ADS on December 1, 2014.  More than 9.39 million MOL ADSs traded that day:  more than 40 times the average daily trading volume for MOL ADS (228,000) between the IPO and MOL's corrective disclosures (*i.e.*, the period between October 10 and November 20, 2014).

143.  MOL and Defendant Bangah, in their December 1, 2014 disclosures, attributed the sharp declines in MOL ADS prices (euphemized as "volatility") to disclosure of the inaccuracy of MOL's historical financial results, and to MOL's poor Q3 2014 results.  MOL's December 1, 2014 press release, quoting Defendant Bangah, stated in relevant part:

Mr. Ganesh Kumar Bangah, Chief Executive Officer of MOL, stated, "Despite some volatility in the start of our life as a public company, we are pleased to report growth for our core, e-payments platform. **The discovery of an error in the presentation of revenue and direct costs and other ancillary expenses at our Vietnamese subsidiary as well as softness in our MMOG.asia gaming business have created volatility** that we are addressing . . . (emphasis added)

*See* MOL December 1, 2014 press release.

144.  Contemporary reports by the financial press and observations by market participants made identical attributions. *See* ¶ 118, *supra*.

### 4.  Subsequent Disclosures on April 30, 2015

145.  On April 30, 2015, MOL filed its Form 20-F, as well as a Form 6-K, with the SEC. As detailed above, these April 30, 2015 disclosures:

  a.  provided further, minor correction to the Registration Statement's untrue statements of material fact concerning 2013 and 1st half 2014 revenues, revealing that the revenue figures provided in the Registration Statement were overstated to a slightly greater degree than revealed in MOL's prior disclosures between November 20 and December 1, 2014 (as a result of additional, improper revenue recognition at NJSC);

  b.  provided further, minor correction to the Registration Statement's untrue statements of material fact concerning MOL's revenue recognition policies and procedures – namely that NJSC, in addition to improperly recognizing revenue on a gross rather than net basis as disclosed earlier, also improperly recognized amounts collected as VAT as revenue; and

  c.  Revealed that MOL's internal controls over financial reporting were flawed by seven separate material weaknesses, included revenue recognition at NJSC, rather than the two material weaknesses disclosed in the Registration Statement.

## COUNT I

**For Violation of Section 11 of the Securities Act
Against All Defendants Except for Defendant Tan**

146.    Lead Plaintiff repeats and realleges the allegations set forth above in ¶¶ 1-145 as if set forth fully herein.

147.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants except for Defendant Tan (the "Section 11 Defendants").

148.    As set forth more specifically above, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to render the statements made not misleading, and omitted to state material facts required to be stated therein.

149.    MOL is the registrant for the IPO.  The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

150.    As issuer of the ADSs, MOL is strictly liable to Lead Plaintiff and the Class for the material misstatements and omissions in the Registration Statement.

151.    Each of the other Section 11 Defendants is also liable to Lead Plaintiff and the Class for such misstatements and omissions in the Registration Statement as: (a) each of the Individual Defendants that are Section 11 Defendants signed the Registration Statement or provided a signed consent in connection with the Registration Statement; and (b) each of the Underwriter Defendants was an "underwriter," as that term is used in Section 11(a)(5) of the Securities Act, with respect to the IPO and the MOL ADSs issued, offered and sold through the Registration Statement.

152.    Lead Plaintiff and other members of the Class acquired MOL ADSs in the IPO and/or pursuant or traceable to the Registration Statement.

153.    At the time of their purchases of MOL ADSs, Lead Plaintiff and other members of the Class were without knowledge of the Registration Statement's material misstatements of

fact and/or material omissions, and could not have reasonably discovered those facts prior to the post-IPO disclosures that subsequently revealed them.

154.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

155.    The value of MOL ADSs has declined substantially subsequent to the IPO, as the Registration Statement's material misstatements and omissions were later revealed and corrected. Lead Plaintiff and the other members of the Class have sustained damages as a direct and proximate result of Defendants' acts and omissions.

156.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years after MOL ADSs were sold to the Class in connection with the MOL IPO.


## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

157.    Lead Plaintiff repeats and realleges the allegations set forth above in ¶¶ 1-156 as if set forth fully herein.

158.    This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act against all Defendants.

159.    Defendants were sellers, offerors, and/or solicitors of sales of the ADSs offered, issued and sold in the IPO pursuant to the Registration Statement.

160.    Defendants' acts of solicitation included:

   a.   participating in the preparation of the false and/or misleading Registration Statement;

   b.   participating in efforts to market the MOL ADSs to be offered in the IPO to investors, including participating in the Roadshow;

   c.   signing the Registration Statement;

> d.  for the Selling Shareholder Defendants, selling certain of their MOL shareholdings in and through the IPO.

161.    By means of the Registration Statement, and by using the means and instrumentalities of interstate commerce and the U.S. mails, Defendants solicited and sold MOL ADS to Lead Plaintiff and the Class.

162.    Lead Plaintiff and other members of the Class purchased MOL ADSs in the IPO pursuant to the Registration Statement.

163.    As set forth more specifically above, the Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

164.    At the time Lead Plaintiff and other Class Members purchased their MOL ADSs, Lead Plaintiff and other members of the Class did not know, and in the exercise of reasonable diligence could not have known, of the material misstatements of fact, material omissions and/or materially misleading statements contained in the Registration Statement.

165.    Accordingly and by reason of the misconduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act and are liable to Lead Plaintiff and member of the Class who purchased MOL ADSs pursuant to the Registration Statement, each of whom has been damaged as a result of such violation.

166.    Members of the Class who have retained their ADSs have the right to rescind and recover the consideration paid for their ADSs, and hereby elect to rescind and tender their ADSs to Defendants. Members of the Class who have sold their ADSs seek damages to the extent permitted by law.

167.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years after MOL ADSs were sold to the Class in connection with the MOL IPO.

**COUNT III**

**For Violation of Section 15 of the Securities Act**
**Against the Individual Defendants**

168.    Lead Plaintiff repeats and realleges the allegations set forth above in ¶¶ 1-167 as if set forth fully herein.

169.    This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

170.    At all times relevant hereto, the Individual Defendants acted as and were control persons of MOL within the meaning of Section 15 of the Securities Act. Because of their positions of control and authority as officers, directors and/or controlling shareholders of MOL, the Individual Defendants had the power to influence, and exercised the same to cause, MOL to engage in the conduct complained of herein, and were therefore control persons of MOL.

171.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the MOL IPO to be completed.  Each of the Individual Defendants, excepting Tan, signed the Registration Statement (Bangah, White, Wong and Chang) and/or provided a signed consent in connection with the Registration Statement (the Independent Directors), and thus had the power to, and did, influence and control the content of the statements contained therein. Defendant Tan's controlling interest in MOL provided Defendant Tan at all relevant times with the power to influence and control the statements contained therein.

172.    As a result, the Individual Defendants are liable under Section 15 of the Securities Act.

173.    This claim was brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years after MOL ADSs were sold to the Class in connection with the MOL IPO.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages as to Count II; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Lead Plaintiff hereby demands a trial by jury.


Dated: October 7, 2015                           Respectfully Submitted,

                                                 KIRBY McINERNEY LLP


                                                 By: _____/s/ Daniel Hume_____
                                                 Daniel Hume
                                                 Ira M. Press
                                                 825 Third Avenue, 16th Floor
                                                 New York, NY 10022
                                                 Tel:  (212) 371-6600
                                                 Fax:  (212) 751-2540

                                                 *Counsel for Lead Plaintiff TAP Retirement Fund*
                                                 *and Lead Counsel for Class*